Filed 11/30/22  P. v. Gonzalez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICARDO GONZALEZ et al.,<br><br>    Defendants and Appellants. | B302834<br><br>(Los Angeles County Super. Ct. No. NA100818)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>CHANGE IN JUDGMENT |

THE COURT:

The opinion herein, filed on November 9, 2022, is modified as follows:

1.  Page 4, last paragraph, second sentence, beginning with the word "We":  delete the word "therefore".  Insert the following between the word "vacate" and the words "the gang enhancement findings":  "the gang-murder special-circumstance enhancement finding and" so that it reads:

We vacate the gang-murder special-circumstance enhancement finding and the gang enhancement findings under section 186.22, subdivision (b), and the gang firearm enhancement finding under section 12022.53, subdivision (e)(1) under counts 1, 2, and 4; remand for the People to elect to retry those allegations under Assembly Bill 333; and direct the trial court to correct Escalante's presentence custody credits.

2.  Page 76, insert the following before subheading "VIII. Section 1190":

### D.      *Gang-murder special-circumstance finding must be vacated under the law as amended by Assembly Bill 333*

As discussed, the Attorney General concedes that defendants' current offenses cannot be used to establish a pattern of criminal gang activity and that the prosecution proved only one predicate gang offense, not two offenses as required by section 186.22 as amended by Assembly Bill 333.  The gang-murder special-circumstance finding must be vacated for this reason.

3.  Page 89:  In the first sentence under the heading "Disposition" insert the following after the words "For each defendant,":  "the gang-murder special-circumstance allegation finding and" so that it reads:

2

For each defendant, the gang-murder special-circumstance allegation finding and the gang enhancement allegation findings under section 186.22, subdivision (b) under counts 1, 2, and 4, and the gang-related firearm enhancement findings under section 12022.53, subdivision (e)(1) under those same counts are vacated.

The modification changes the judgment. Appellants' petition for rehearing is denied.

_____

LUI, P. J.          CHAVEZ, J.          HOFFSTADT, J.

Filed 11/9/22  P. v. Gonzalez CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B302834 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA100818) |
| v. | |
| RICARDO GONZALEZ et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Mark C. Kim and Judith L. Meyer, Judges. Affirmed in part; vacated in part and remanded with directions.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant Ricardo Gonzalez.

Laura S. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant Carlos Alexis Escalante.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Defendants and appellants Ricardo Gonzalez and Carlos Alexis Escalante[1] were convicted of the murder of Enrique Lopez, Jr. (Pen. Code, § 187, subd. (a))[2] (count 1), attempted murder of David Osuna (§§ 664, 187, subd. (a)) (count 2), and attempted murder of Jerry Frazier (§§ 664, 187, subd. (a)) (count 4). As to count 1, the jury found true two special circumstance allegations—that the murder was perpetrated by means of discharging a firearm from a motor vehicle at persons outside the vehicle with the intent to cause death (§ 190.2, subd. (a)(21)) and that defendants killed Lopez, Jr., while they were active participants in a criminal street gang and to further the activities of the gang (§ 190.2, subd. (a)(22)). As to counts 1, 2, and 4, the jury found true allegations that defendants committed the offense for the benefit of a gang (§ 186.22, subd. (b)) and that a principal discharged a firearm causing great bodily injury (§ 12022.53, subds. (d), (e)(1)). The jury also convicted Gonzalez of transportation for sale of a controlled substance (Health & Saf. Code, § 11379, subd. (a)) (count 8) and possession of a controlled

---

[1]     Gonzalez and Escalante are referred to collectively as defendants.

[2]     All further statutory references are to the Penal Code unless stated otherwise.

2

substance with a firearm (Health & Saf. Code, § 11370.1, subd. (a)) (count 9).[3]

Gonzalez was sentenced to life without parole (LWOP) plus 55 years to life. Escalante was sentenced to LWOP plus 30 years to life.

Defendants appeal from the judgments. They contend the trial court erred by (1) improperly admitting into evidence statements defendants made to undercover agents during a *Perkins*[4] operation; (2) improperly admitting into evidence defendants' hearsay statements implicating each other in the crimes; (3) improperly limiting discovery and testimony about the *Perkins* operation; (4) committing prejudicial judicial misconduct during jury selection; (5) committing prejudicial judicial misconduct during a defense expert witness's testimony, and then

---

[3]     An amended 14-count information charged defendants with offenses arising from three separate shooting incidents and certain drug-related offenses. Counts 1 through 5 involved a shooting on May 26, 2014, that is the subject of this appeal. Counts 6, 7, and 10 involved a shooting on October 23, 2014. Counts 8 and 9 involved controlled substance charges. Counts 11 through 14 charged only Gonzalez and involved a shooting on October 17, 2014.

The jury returned a not guilty verdict on count 5 (the attempted murder of Juan Cortez, who was present during the May 26, 2014 shooting) and deadlocked on count 3 (attempted murder of Enrique Lopez, Sr., also present during the May 26, 2014 shooting) and counts 6, 7, 10, 11, 12, 13 and 14. The trial court dismissed counts 6, 7, 10, 11, 12, 13 and 14.

[4]     In a "*Perkins* operation," a suspect is placed in a cell with an undercover agent and their conversation is audio recorded. (See *Illinois v. Perkins* (1990) 496 U.S. 292.)

3

improperly presiding over Escalante's new trial motion; and (6) improperly instructing the jury with CALCRIM No. 315, and then allowing the prosecutor to make misleading statements about that instruction. Defendants further contend (7) the prosecution's proof of the gang predicate offenses violated section 186.22, as amended by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333), as well as the hearsay rule and the confrontation clause; (8) section 1109, which became effective on January 1, 2022, and allows a defendant to request bifurcation of a gang enhancement allegation from the underlying offense, applies retroactively and requires a new trial on the murder and attempted murder charges; (9) defendants' LWOP sentences violate equal protection, Escalante was denied a proper *Franklin*[5] hearing, and his counsel's failure to present mitigating evidence constituted ineffective assistance of counsel; (10) defendants' LWOP sentences constitute cruel and unusual punishment; (11) the driveby shooting special circumstance is unconstitutional; (12) the cumulative errors were prejudicial; and (13) Escalante is entitled to additional presentence custody credit.

The Attorney General concedes that under Assembly Bill 333, the gang sentence enhancements under section 186.22, subdivision (b) and the gang firearm enhancement under section 12022.53, subdivision (e)(1) must be vacated and that Escalante is entitled to additional presentence custody credit. We therefore vacate the gang enhancement findings under section 186.22, subdivision (b), and the gang firearm enhancement finding under section 12022.53, subdivision (e)(1) under counts 1, 2, and 4; remand for the People to elect to retry those allegations under

---

[5]     *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

Assembly Bill 333; and direct the trial court to correct Escalante's presentence custody credits. We otherwise affirm the judgments.

## FACTUAL BACKGROUND

**The shooting**

On May 26, 2014, about 12:30 p.m., Lopez, Jr., a Westside Longo gang member, was standing near his sister Susanna Lopez's car near the corner of 65th Street and Paramount Boulevard in Long Beach. His father, Enrique Lopez, Sr.; Susanna's boyfriend David Osuna; neighbor Jerry Frazier; a mechanic named Juan Cortez; and two children were also present.

Frazier saw a blue Honda Civic driving east on 65th Street toward Paramount Boulevard. The car slowed as it approached. The front passenger had a gun and fired several rounds. When Frazier saw the gun, he hid behind a blue dumpster. He heard several bullets hit the dumpster. When the shooting began, Lopez, Sr., and Cortez ducked and Osuna ran. Osuna suffered a bullet wound to the leg. Lopez, Jr., was killed by a single gunshot to his upper middle back.

Lopez, Sr., told police that on the morning of the shooting, he saw a blue Honda or Toyota drive by. He saw the passenger make hand signs. Lopez, Sr., later identified Escalante as the passenger in a Facebook photograph provided by detectives. At trial, Lopez, Sr., pointed to Escalante, who was seated in the courtroom, as the person he identified as the vehicle passenger when he was interviewed by detectives.

Three nine-millimeter bullet casings were found in the street near the corner of Paramount Boulevard and 65th Street. Another nine-millimeter casing was found on 65th Street near

the blue dumpster, which had a bullet hole.  The recovered casings were fired from the same gun.

**Defendants' arrest**

On November 19, 2014, Long Beach Police Officer Andrew Fox conducted a traffic stop of a blue Honda Civic.  Escalante was driving and Gonzalez was the front passenger.  Both were arrested.  Gonzalez was 19 years old at the time.  Escalante was 18 years old but would be 19 the following month.

On the day of their arrest, defendants were questioned separately by Detective Robert Gonzalez about a different shooting that occurred on October 23, 2014.  At the outset of the interview, Detective Gonzalez advised defendant Gonzalez of his *Miranda*[6] rights.  Defendant Gonzalez indicated he understood and began talking to the detective.  Defendant Gonzalez subsequently requested an attorney, and the detective stopped questioning him.

Detective Gonzalez also advised Escalante of his *Miranda* rights at the outset of his interview.  Escalante indicated that he understood and continued speaking with Detective Gonzalez until the interview was concluded.

**_Perkins_ operations**

On November 20, 2014, Detective Sean Irving conducted a *Perkins* operation by placing defendants in separate cells at the Long Beach jail with paid agents who posed as fellow inmates.  An audio recording of the operation was played for the jury.

### *Gonzalez*

Gonzalez was placed in a cell with two *Perkins* agents (designated in the transcript of the operation as PA1 and PA2).

---

[6]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

PA1 was a Hispanic male in his mid-30's, approximately six feet tall and weighed 300 pounds. PA2 was in his early 30's, approximately five feet 10 inches tall, and weighed 180 pounds. PA2 had visible tattoos on his arms.

While the agents were in his cell, Gonzalez told PA1 that he was an Unos Sin Verguenzas (USV) gang member known as "Glock." Detective Peter Lackovic subsequently entered the cell area and informed Gonzalez that he was being investigated for a murder that occurred on 65th Street. Lackovic told Gonzalez, "Your boy Rascal's already here. You already know that." Before leaving the cell area, Lackovic asked Gonzalez, "You all straight?" Gonzalez responded, "Cool." Lackovic said, "If you need anything, tell one of the jailers." Gonzalez said, "All right."

When Lackovic left the cell area, PA1 asked Gonzalez, "What; you, like, the most live homie from the hood or what?" Gonzalez replied, "Shit, I didn't get 'Glock' for no reason." PA1 said, "I need some youngsters like that on my team, fool." PA1 then asked Gonzalez, "who's the fool that [Lackovic] was talking about?" Gonzalez identified him as "the homie" who was arrested with him and acknowledged that he was Gonzalez's "crime partner."

Detective Gonzalez later entered the cell area to obtain a DNA sample from defendant Gonzalez. The detective asked Gonzalez, "How long you doing?" Gonzalez responded, "Good." Detective Gonzalez then asked, "They treating you all right?" Defendant Gonzalez said, "Yeah."

Defendant Gonzalez told the *Perkins* agents he was 19 years old, had been "affiliated" with the USV gang since he was 13, and started "banging" at age 16. He said the 65th Street shooting had occurred during the day and that he had used a

7

Smith and Wesson firearm.  Gonzalez told the agents he was driving his mother's blue Honda Civic when he and Escalante passed a group of people, whom they did not know.  One member of the group had a "Longo" tattoo on the back of his neck.  Escalante exited the Honda and started "banging" on the group.  Gonzalez told him to get back into the car because they would return later.  After switching the Honda's license plates to dealer plates, Gonzalez and Escalante returned to the victims' location.  This time, Escalante drove and Gonzalez was the passenger.  An older gang member known as "Lento" accompanied them.  When Escalante stopped the Honda at the victims' location, Gonzalez fired nine rounds at the group.  Gonzalez saw "four fools down, but only one down, down."  Gonzalez also shot at a "big old black guy" who hid behind a trash can.  The following day, Gonzalez sold the gun he had used in the shooting to members of another gang.  When one of the *Perkins* agents asked Gonzalez whether he felt any remorse about the shooting, Gonzalez responded, "No. Hell no."

### *Escalante*

Escalante was placed in a cell with the same larger *Perkins* agent (PA1) who had been in Gonzalez's cell.  At some point during the operation, Escalante made a telephone call.  He asked the *Perkins* agent to help him remember some numbers, and the agent complied.  When he finished the call, Escalante asked the agent, "what they got you for?"  The agent responded, "got a warrant for murder."  Escalante said, "me fucking too."  Escalante then asked the agent, "where you from?" and stated that he (Escalante) was "USV."  Later, the *Perkins* agent also made a telephone call.  During the call, the *Perkins* agent said, "hey do me a favor . . . and try to post my bail.  Yeah . . . put the

8

house.  They got me for that shit over there in L.A. . . .  Okay.  Make sure you get it done."

Detective Lackovic later entered the cell area and told Escalante he and "Plato" had been arrested for a murder on 65th Street and that Escalante had been identified as the shooter.  Lackovic said he knew Escalante's moniker was Rascal and that Gonzalez was known as Plato.  When Lackovic left, the *Perkins* agent asked Escalante "who's Plato?"  Escalante identified him as "[t]he homie" who shot at the victims on 65th Street.  Escalante stated, "He shot.  I drove."  Escalante verified that Plato was also known as Glock.  Escalante also acknowledged that his moniker was Rascal.

Escalante said the shooting had occurred in May during the day.  He and Gonzalez were driving by when they first saw the victims.  Gonzalez and Escalante did not know the victims, who were "banging" on them, or challenging them.  Gonzalez was driving at the time, a blue "low key ass car."  Gonzalez, Escalante, and an older gang member known as "Gecko" or "Gunner" returned to the victims' location that same day.  Before doing so, Escalante and Gonzalez switched places.  Escalante drove because Gonzalez "wanted to bust" on the victims.  Gonzalez fired eight rounds at the victims.  Gonzalez subsequently sold the gun he had used in the shooting.

**Defendants' jail conversation**

After the *Perkins* operation, defendants were placed in nearby cells with a recording device in the cell between them.  An audio recording of their conversation was played for the jury.

Escalante told Gonzalez during their recorded conversation that a detective came to see him about the incident "that happened on Six-Five."  Escalante said, "I was driving in Six-

9

Five" and "I'll go down as the driver, . . . but . . . I ain't gonna be the shooter." Escalante further stated, "I'm trippin about the Honda," and "they got the car." Gonzalez reassured him that the Honda "didn't have the regular plates" during the shooting. Escalante asked, "What happened to those plates?" Gonzalez responded that he threw them away.

Gonzalez said, "[N]obody seen us that . . . day. When the shots were going off, everybody was gone." Escalante replied, "I was driving dog, I don't know." Gonzalez responded, "I could see." When Escalante asked Gonzalez what kind of gun he had used, Gonzalez replied, "Smith and Wess. Nina." Gonzalez and Escalante discussed fabricating an alibi and alternate locations where they could say they had been at the time of the shooting. These included Plaza Mexico, a barbeque, or a cemetery. Gonzalez pointed out that the police would attempt to verify the time and location of defendants' proposed alibi and could use security camera footage to do so. Gonzalez advised, "Be, like, we don't . . . remember."

Escalante and Gonzalez discussed their respective encounters with the *Perkins* agents and determined they had both been with the same person. Escalante referred to the *Perkins* agent as the "[f]at nigga" and said, "That fool's cool."

## RELEVANT PROCEDURAL BACKGROUND

Gonzalez filed a motion to exclude his statements made during the *Perkins* operation, arguing they were obtained in violation of his constitutional rights to counsel, to remain silent, and due process. His motion was supported by the declaration of Martin Flores, a gang expert, who opined in relevant part as follows:

10

"It is my personal, educational, and professional opinion that . . . the confidential informants utilized in this operation made their gang status and ties to the Mexican Mafia to Mr. Ricardo Gonzalez by talking about their crimes and knowledge of gang members. They command a presence of being very knowledgeable of the gang dynamics and the jail politics. [¶] . . . [¶] In my extensive experience with Perkins Operations . . . the informants are NOT just . . . a very experienced inmate that upon immediate contact the target realizes that they are being questioned by somebody who can impact their jail experience. This tactic brings an environment of duress and pressure to either fabricate or exaggerate their role in an alleged crime."

The prosecutor opposed the motion.

At a January 4, 2018 hearing, Escalante made an oral motion to join Gonzalez's motion to exclude the *Perkins* statements. Gonzalez's counsel indicated he intended to offer Flores' testimony, stating:

> "He's an expert in the matter of gangs. He has an opinion . . . as to the influence of a Mexican Mafia shot caller in a cell . . . with a 19-year-old person who is in jail for the first time . . . and as a gang member, what his mindset would be . . . ."

The trial court (Hon. Mark C. Kim) stated, "The only one that could tell me whether he was coerced or not is the person claiming that he was coerced." The court further stated:

> "[I]t does not matter what your expert knows. The question is at the time of the conversation was [Gonzalez] aware who these individuals were, that they were Mexican Mafia members that you allege because, if he didn't know, it's irrelevant."

11

Gonzalez testified at the hearing. When his attorney asked him who he thought one of the *Perkins* agents might be, Gonzalez replied, "I didn't know who he was. I just—just another person." Gonzalez further testified he had never been in jail before. He stated: "I felt afraid. I felt I had to go along with it, impress— say whatever I can, whatever I knew about what had happened, you know, just to feel like I'm on the same page with them."

On cross-examination, Gonzalez admitted he was laughing when he talked to the *Perkins* agents and that they had also talked about girls. He further admitted that the agents never said they were members of the Mexican Mafia or verbally threatened him. Gonzalez testified that the agents made threatening gestures, but when asked to explain further he replied, "I couldn't—I can't recall." Gonzalez also testified that on the day before the *Perkins* operation, detectives tried to question him about a different attempted murder, and he asked for a lawyer.

Gonzalez's counsel then sought to call Flores as a witness. When the trial court asked for a proffer, counsel responded, "The proffer is the state of mind of [Gonzalez]." The trial court stated: "He can't testify as to state of mind of Mr. Gonzalez. He's not an expert on state of mind. [H]is designated expertise is gang membership, gang crimes." The following exchange ensued:

> "[Gonzalez's counsel]: My proffer is he would testify to being a gang member. What does that mean being placed in a cell with older gang members who have been to prison, and what would that mean to you as being a gang member in the cell, a young gang member? How would that affect what or what you did not say . . . .

12

"The court: I guess the only problem is the person that would have an effect has already testified. So how would Mr. Flores add to that?

"[Gonzalez's counsel]: As I said, he would add—as far as . . . fleshing out the circumstances of how gang members react to each other.

"The court: But we have the best source, the person that just testified. He told us how it affected him in that circumstances." (Boldface omitted.)

The court ruled Flores's testimony not relevant.

Detective Lackovic then testified that the *Perkins* agents were Hispanic, in their 30's, and had tattoos. One of the agents was about five feet four inches tall, and the other was around six feet fall. Both were "kind of fat."

After hearing argument from counsel, the trial court denied the motion to exclude Gonzalez's statements. The court found, based on Gonzalez's demeanor and testimony, that Gonzalez lacked credibility and that the motion was without merit.

Escalante then testified. He described the *Perkins* agent in his cell as approximately six feet four inches tall and 300 pounds, in comparison to Escalante, who was five feet seven inches tall. Escalante testified that he thought to himself, "the guy has not approached me. Maybe I should stay out of his way." Escalante further testified that the *Perkins* agent said that he had gotten rid of a witness. Escalante said he was afraid. After overhearing the *Perkins* agent's telephone call in which the agent gave instructions to post his bail and "put the house up," Escalante believed the agent had rank in a gang. He thought, "if this guy approaches me, I'll just get on his good side" and say what he wants to hear.

13

On cross-examination, Escalante admitted that he initiated the conversation with the *Perkins* agent and that Escalante voluntarily disclosed that he had been arrested for murder. Escalante further admitted that when he made a telephone call, he asked the agent to help him remember a number.

Escalante testified that the agent never "directly" threatened him. Escalante explained: "He sent subliminals. He would tell me things like, you know, as far as there's no witness. I mean, that means pretty much he did something to the witness."

On January 5, 2018, after hearing argument from counsel, the trial court denied the motion to exclude Escalante's statements to the *Perkins* agent. The court ruled that *Miranda* was not implicated and that, based on the totality of the circumstances, there was no coercion.

The case was subsequently reassigned to the Honorable Judith L. Meyer, who presided over the trial. Defendants filed motions to exclude their *Perkins* statements, which Judge Meyer denied.

## TRIAL TESTIMONY

### Prosecution gang expert testimony

Los Angeles County Sheriff's Detective Miguel Fuentes, the prosecution's gang expert, testified that he was familiar with a Hispanic gang known as USV. Fuentes opined that members of the USV gang, individually and collectively, have engaged in a pattern of criminal gang activity, including assault with a deadly weapon, attempted murder by use of a firearm, and murder by use of a firearm. After being presented with a hypothetical based

on the facts of this case, Fuentes opined the subject crimes were committed for the benefit of and in association with a gang.

Fuentes further testified that he was familiar with a separate case involving USV gang members Jose Rangel, Enrique Hernandez, and Jesus Hernandez, who were convicted on August 15, 2014, of the murder of Jonathan Sandoval, a member of a rival gang.

**Defense evidence**

Dr. Kathy Pezdek testified as a defense expert on eyewitness identification. She discussed 10 factors that can affect the accuracy of eyewitness identification: (1) exposure time, (2) distance and obstruction, (3) weapon focus, (4) stress, (5) use of a disguise, (6) cross-racial identification, (7) time delay, (8) biased identification test, (9) double-blind procedure, and (10) bias of in-court identification.

Gairy Jackson, who witnessed the shooting through the window of his apartment, also testified as a defense witness. Jackson observed a slow-moving black, four-door hatchback approach the victims and then heard four to five gunshots. He saw Lopez, Jr., fall to the ground. Jackson further testified he saw the driver of the car and the passenger, both of whom appeared to be African-American males.

## DISCUSSION

**I.      Admission of defendants' statements during the *Perkins* operation did not violate their constitutional rights**

**A.      Miranda**

A defendant's statements made during a custodial interrogation are inadmissible against him unless he was advised

15

of his *Miranda* rights[7] and did not invoke his right to remain silent or to be represented by counsel. (*People v. Orozco* (2019) 32 Cal.App.5th 802, 811 (*Orozco*).) This rule protects the privilege against self-incrimination guaranteed by the Fifth Amendment. (*Orozco*, at p. 811.) In addition, once a suspect invokes the right to counsel, he cannot be subjected to further police interrogation on any crime unless counsel is present or the suspect initiates further communication with the police. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 (*Edwards*).)

The *Miranda* rule has a limit, however—it only applies when the suspect was the subject of a "custodial interrogation." (*Miranda, supra*, 384 U.S. at p. 444; see *Orozco, supra*, 32 Cal.App.5th at p. 811.) *Miranda* does not apply when a suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement. (*Perkins, supra*, 496 U.S. at p. 294.) Statements made to an undercover agent posing as a fellow inmate accordingly are not subject to *Miranda*. (*Perkins*, at p. 296; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 283 [no *Miranda* violation when defendant spoke to fellow inmate wearing a recording device]; *People v. Williams* (1988) 44 Cal.3d 1127, 1141-1142 [*Miranda* "has never been applied to conversations between an inmate and an undercover agent"].)

Gonzalez argues that the use of *Perkins* agents, following the invocation of his right to counsel the preceding day, violated

---

[7] *Miranda* requires that a suspect in law enforcement custody must be advised of the right to remain silent, that anything the suspect says may be used as evidence against him, that he has the right to the presence of an attorney, and that an attorney will be provided if the suspect cannot afford one. (*Miranda, supra*, 384 U.S. at pp. 444-445, 473-474, 476.)

16

his constitutional rights to remain silent and to counsel. Escalante concedes the record does not indicate that he invoked his *Miranda* rights before the *Perkins* operation but nevertheless asserts a *Miranda* claim.

Escalante's claim is without merit. As our state high court has noted, "the [United States Supreme Court] has held that at least where no prior invocation [of *Miranda* rights] is in effect, ['][c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate.'" (*People v. Fayed* (2020) 9 Cal.5th 147, 165, quoting *Perkins, supra*, 496 U.S. at p. 296.)

Gonzalez's prior invocation of his *Miranda* right to counsel did not require suppression of his statements to the *Perkins* agents. (*Orozco, supra,* 32 Cal.App.5th at p. 812.) "[A] suspect who has invoked his *Miranda* right to counsel may not be 'subject[ed] to further *interrogation* by the authorities' on any crime at all unless (1) counsel is present 'at the time of [any further] questioning,' or (2) the suspect 'himself initiates further communication, exchanges or conversations with the police.'" (*Id.* at p. 813, quoting *Edwards, supra*, 451 U.S. at pp. 484-485.) "[T]here is no 'interrogation' when a suspect speaks with someone he does not know is an agent of the police." (*Orozco*, at p. 814.) There is accordingly no reason to apply the restriction on further "interrogation" in such circumstances. (*Ibid.*) Admission of Gonzalez's *Perkins* statements did not violate his rights under *Miranda*.

17

**B.** *Due process*

Defendants contend admission of their statements to the *Perkins* agents violated their due process rights because the statements were not made voluntarily. The due process clauses of the federal and California Constitutions bar the admission of an involuntary confession. (*People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199.) To determine the voluntariness of a confession, we assess the circumstances to see if the defendant's will was overborne. (*Ibid.*) A confession may be involuntary "'if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence.'" (*People v. Wall* (2017) 3 Cal.5th 1048, 1066.)

We independently review a trial court's determination of voluntariness given the circumstances, including the characteristics of the accused and the details of the encounter. (*People v. Richardson* (2008) 43 Cal.4th 959, 992-993, abrogated on other grounds by statutory repeal as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509.) In doing so, however, we defer to the trial court's factual findings if supported by substantial evidence. (*Ibid.*) We therefore "accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502.)

Substantial evidence supports the trial court's determination defendants' statements to the *Perkins* agents were voluntary and that their claims of intimidation and coercion were not credible. At the hearing on his motion to suppress, Gonzalez admitted laughing with the *Perkins* agents and talking with

18

them about girls. Detectives came to Gonzalez's cell several times during the *Perkins* operation to ask Gonzalez if he was alright, if he needed anything, and if his cellmates were treating him all right. Gonzalez never indicated that there was any problem or that he was afraid of the agents. Gonzalez testified that the agents never identified themselves as members of the Mexican Mafia and never threatened him verbally. He could not recall any threatening gestures by the agents.

Escalante admitted initiating the conversation with the *Perkins* agent and voluntarily disclosing that he had been arrested for murder. He asked the *Perkins* agent for help in remembering some numbers while making a phone call. Escalante admitted that the agent never threatened him verbally. He further admitted that he never told any of the detectives who came to his cell during the *Perkins* operation that he was afraid of or felt intimidated by the agent. The record does not support Escalante's claim that the agent questioned him "aggressively," seeking to elicit an admission that he and Gonzalez had been looking for enemies on the day of the murder. When the *Perkins* agent twice asked Escalante whether he and Gonzalez had been looking for enemies on the day of the shooting, Escalante replied, "Nah, we drove by and, like, they, they were, like, banging on us, you know."

Defendants' jailhouse conversation with each other after the *Perkins* operation further undermines the claim that they were afraid of the agents. Defendants spoke positively about the agents, and Escalante stated that the agent in his cell was "cool."

The record does not support defendants' claim that they fabricated their involvement in the crimes. Their separate statements to the *Perkins* agents contained corroborating details

19

about the crimes.  Both defendants admitted that the shooting occurred in May during the day, that they did not know the victims, that Gonzalez was the shooter and Escalante was the driver, and that Gonzalez thereafter sold the weapon. Defendants made similar admissions in the conversation between themselves after the *Perkins* operation.

*Arizona v. Fulminante* (1991) 499 U.S. 279, on which defendants rely as support for the argument that their statements were coerced, is distinguishable.  The informant in that case told the defendant that he knew the defendant was "'starting to get some tough treatment and whatnot'" from other inmates because the defendant had killed a child.  (*Id.* at p. 283.) The informant then offered to protect the defendant, stating, "'"You have to tell me about it . . . [f]or me to give you any help."'" (*Ibid*.)  The Supreme Court concluded that the "fear of physical violence, absent protection from [the agent]" caused the defendant's will to be "overborne in such a way as to render his confession the product of coercion."  (*Id.* at p. 288.)  No such circumstances are present here.

Moreover, as the trial court noted, both defendants, though young, were experienced gang members.  Gonzalez, who was 19 years old at the time of the *Perkins* operation, had been "affiliated" with a gang from the age of 13 and started "banging" when he was 16.  Escalante was one month shy of his 19th birthday at the time of the *Perkins* operation and had been a gang member since he was 12 or 13 years old.

Cases defendants cite as support for their due process claims are inapplicable or inapposite.  Gonzalez relies on Justice Brennan's concurrence and Justice Marshall's dissent in *Perkins, supra*, 496 U.S. 292 and Justice Liu's dissents from a denial of

20

review in *People v. de Jesus Valencia* (Aug. 5, 2019, B283588) (nonpub. opn.), review denied Dec. 11, 2019, S258038, and *People v. Godbolt* (Mar. 12, 2021, B302235) (nonpub. opn.), review denied Jun. 30, 2021, S268148, as support for his argument that use of undercover agents to elicit his statements following his request for counsel violated due process.[8]  Concurring and dissenting opinions are not binding precedent (see *Rosato v. Superior Court* (1975) 51 Cal.App.3d 190, 211), and Gonzalez cites no authority applying the views expressed in those concurring and dissenting opinions.  To the contrary, ". . . California courts have uniformly come to the conclusion that *Perkins* controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the police." (*Orozco, supra*, 32 Cal.App.5th at p. 815; see *People v. Plyler* (1993) 18 Cal.App.4th 535, 544-545; *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1540-1541.)

---

[8]  Justice Brennan expressed a belief that "the deception and manipulation practiced on [Perkins] raise[d] a substantial claim that the confession was obtained in violation of the Due Process Clause." (*Perkins, supra*, 496 U.S. at p. 301 (conc. opn. of Brennan, J.).)  Justice Marshall noted that "where the suspect is incarcerated, the constant threat of physical danger peculiar to the prison environment may make him demonstrate his toughness to other inmates by recounting or inventing past violent acts." (*Id.* at p. 307 (dis. opn. of Marshall, J.).)  In his dissenting statement to the California Supreme Court's denial of a petition for review, Justice Liu stated "[I]t is difficult to see how the use of deceptive schemes by the police to continue questioning the suspect can be compatible with "'preserv[ing] the integrity of accused's choice to communicate with police only through counsel.'"" (*People v. de Jesus Valencia, supra*, S258038, review denied (dis. stmt. of Liu, J.).)

21

Escalante cites no authority to support his argument that the tactics employed in this case—placing him with an older and much larger agent posing as a gang "shot caller" who questioned Escalante "aggressively"—exceeded the bounds of due process. *Miller v. Fenton* (1985) 474 U.S. 104, cited by Escalante, did not involve a *Perkins* operation but addressed whether the voluntariness of a confession obtained during a police interrogation was a factual or legal question for purposes of appellate review. (*Id.* at pp. 105-106.) That case accordingly is inapposite.

The totality of the circumstances leads us to conclude, as the trial court did, that defendants' statements to the *Perkins* agents were voluntary and not the product of coercion or psychological pressure.

## C.    *Exclusion of defendants' gang expert testimony*

The trial court properly excluded proposed testimony by defendants' gang expert, Flores, as not relevant to determining whether defendants' *Perkins* statements were voluntary. The trial court has broad discretion to determine the relevance of evidence. (*People v. Jones* (2013) 57 Cal.4th 899, 914.) We will not disturb the exercise of that discretion unless the trial court acted in an arbitrary, capricious, or patently absurd manner. (*Ibid.*)

The record discloses no abuse of discretion. In a declaration attached to a motion to exclude Gonzalez's *Perkins* statements, gang expert Flores opined that the *Perkins* agents used in this case "made their gang status and ties to the Mexican Mafia to" Gonzalez and "command[ed] a presence of being very knowledgeable of the gang dynamics and the jail politics." Flores further opined that defendants who encounter such agents

realize "they are being questioned by somebody who can impact their jail experience" and that use of this tactic creates "an environment of duress and pressure to either fabricate or exaggerate their role in an alleged crime." The trial court ruled that Flores's testimony was not relevant because only defendants could testify as to the effect the *Perkins* agents had on them.

The trial court properly concluded that Flores's testimony was not relevant to determining whether Gonzalez or Escalante felt pressured to fabricate their involvement in the crimes. An expert may not testify regarding an individual's subjective knowledge or intent. (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 647, disapproved on another ground in *People v. Vang* (2011) 52 Cal.4th 1038, 1049.) The trial court's exclusion of Flores' testimony was not an abuse of discretion.

## II. Admission of defendants' *Perkins* hearsay statements against each other under Evidence Code section 1230

The trial court did not abuse its discretion by admitting defendants' *Perkins* statements implicating each other under the hearsay exception provided in Evidence Code section 1230.

### A. *Proceedings below*

At a hearing on a motion by Gonzalez to sever his case from Escalante's, the trial court and counsel for defendants discussed whether Escalante's statements to the *Perkins* agent were admissible as declarations against penal interest. Gonzalez's counsel argued the statements were not against Escalante's interest because Escalante minimized his role and shifted the blame for the shootings to Gonzalez. The trial court ruled the statements were admissible, noting that while Escalante denied being the shooter, "[h]e admitted to everything else . . . ."

At trial, Escalante objected on hearsay and due process grounds to statements by Gonzalez that implicated Escalante. Gonzalez also renewed his objection to statements made by Escalante. The trial court overruled the objections.

**B.** *Applicable law and standard of review*

Evidence of a statement made other than by a witness while testifying and "offered to prove the truth of the matter stated" is inadmissible unless it comes within a hearsay exception. (Evid. Code, § 1200.) The exception relevant here, set forth in Evidence Code section 1230, provides that when the "declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it were true." (Evid. Code, § 1230.)

"[A] person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest." (*People v. Spriggs* (1964) 60 Cal.2d 868, 874.) "'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'" (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334 (*Greenberger*).) The trial court should "'look to the totality of the circumstances in which the statement was made, whether the

24

declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry.'" (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1400 (*Arauz*).)

We review the trial court's decision to admit evidence under Evidence Code section 1230 for abuse of discretion. (*Grimes, supra*, 1 Cal.5th at p. 711.) The decision "'"'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"'" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108.)

### C.    *No abuse of discretion*

The trial court did not abuse its discretion by admitting defendants' respective *Perkins* statements in their entirety. Our Supreme Court has rejected "a rigid or hypertechnical . . . rule that would in all cases require exclusion of even those portions of a confession that are inextricably intertwined with the declarant's admission of criminal liability." (*Grimes, supra*, 1 Cal.5th at p. 716.) The Supreme Court explained that "the nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant." (*Ibid.*)

Gonzalez's and Escalante's respective statements implicating each other in the crimes were inextricably entwined. Escalante repeatedly stated that he drove and Gonzalez shot at the victims. He told the *Perkins* agent: "I remember what happened that day. We drove around. I was driving. He shot again, this nigga. I'm not gonna go down for this nigga like that." Escalante reiterated, "He shot. I drove." He later stated: "he

25

[(Gonzalez)] lit them up. And I remember I put the car in neutral . . . . Then I put it in drive, and we took off."

Escalante also indicated that he knew Gonzalez intended to shoot the victims. Escalante told the *Perkins* agent that when defendants initially encountered the victims, Gonzalez had been driving and Escalante was the passenger. They switched places before returning to the victims' location "[b]ecause [Gonzalez] wanted to bust, and I let him . . . . [¶] . . . [¶] . . . He's like, 'Let me bust.' So I was, like, all right . . . .'"

Escalante's statements inculpating both himself and Gonzalez in the driveby shootings, were not, as Gonzalez contends, purely self-serving. Identifying Gonzalez as the shooter and himself as the driver necessarily implicated Escalante as an aider and abettor to murder. *People v. Gallardo* (2017) 18 Cal.App.5th 51 (*Gallardo*), on which Gonzalez relies, is distinguishable. The declarant in that case told informants that he waited around the corner in a getaway vehicle while two other codefendants shot the victims from a separate vehicle. (*Id.* at p. 55.) The court in *Gallardo* concluded the declarant's statements, which provided conflicting versions of the crime, were "too '"self-serving and unreliable"'" to qualify as declarations against penal interest. (*Id.* at pp. 74-76.) Here, in contrast, Escalante made no attempt to mitigate his role in the crimes. He admitted knowing in advance that Gonzalez intended to shoot the victims and further admitted to driving the vehicle from which the shots were fired. Escalante's admissions about his involvement in the crimes were not conflicting. He consistently said that he drove and that Gonzalez shot at the victims.

Gonzalez's statements implicating Escalante as the driver were similarly entwined with admissions that Gonzalez was the

26

shooter.  Gonzalez identified Escalante as his crime partner. When the *Perkins* agent asked "who was with you?" during the shooting, Gonzalez responded, "My boy.  [¶]  . . .  [¶]  . . . The homie's that right here."  The following exchange then occurred:

> "PA 2:  Oh, the one you said, Rascal?
>
> "RICARDO GONZALEZ:  Yeah.
>
> "PA 2:  And he—what—what was he, he was the shooter or the driver?
>
> "RICARDO GONZALEZ:  He was the driver. . . .  [¶]  . . .  [¶]
>
> "PA 1:  Oh, so he let you bust? . . .
>
> "RICARDO GONZALEZ:  Well, I told him, 'Hey, fool, drive.'"

We are unpersuaded by Escalante's argument that Gonzalez's *Perkins* statements should have been redacted to exclude not only statements implicating Escalante but also those portions purportedly irrelevant to the subject crimes, including statements about a separate shooting in which Gonzalez was the driver and Escalante was the passenger, and Gonzalez's statements about girls.  Gonzalez's conversation with the *Perkins* agents, including those portions challenged by Escalante, were relevant to defendants' arguments that their admissions were false or exaggerated because of the *Perkins* agents' intimidation. The transcript of Gonzalez's conversation with the agents indicates that the conversation was cordial, that Gonzalez volunteered information to the agents, and that he often laughed and joked with them.  The nature and tone of Gonzalez's conversation with the agents are indicia of the reliability and inherent trustworthiness of his statements.  (See *Idaho v. Wright* (1990) 497 U.S. 805, 822-823.)

27

**D.** *No constitutional violation*

Defendants' due process challenge to the admission of their statements, premised on their alleged unreliability, fails because the statements qualify as declarations against penal interest. Such statements "must be genuinely and specifically inculpatory of the declarant; this provides the 'particularized guarantee of trustworthiness' or 'indicia of reliability' that permits its admission in evidence." (*Greenberger, supra*, 58 Cal.App.4th at p. 329.)

Admission of defendants' *Perkins* statements implicating each other did not violate their Sixth Amendment right to confront witnesses. The confrontation clause is concerned solely with hearsay statements that are testimonial. (*Davis v. Washington* (2006) 547 U.S. 813, 823-825; *People v. Cage* (2007) 40 Cal.4th 965, 981.) To be testimonial, the statement must have been given "under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony" given by witnesses at trial. (*Cage, supra*, at p. 984.) In addition, "the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial." (*Ibid.*) "Although the declarant and the interrogator's perspectives are both relevant to determining the 'primary purpose' of the statement [citation], it is '"in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." [Citation.]' [Citation.] The Sixth Amendment applies when the statement, rather than the question that elicited it, was made '"with some degree of formality or solemnity."'" (*Gallardo, supra*, 18 Cal.App.5th at pp. 67-68.)

28

Applying these principles, California courts have held that statements given under similar circumstances as those presented here were nontestimonial, and therefore not subject to the Sixth Amendment right to confront witnesses. (See, e.g., *Gallardo, supra*, 18 Cal.App.5th at pp. 67-68; *Arauz, supra*, 210 Cal.App.4th at p. 1399.) The courts in these cases concluded the defendants' statements to informants were nontestimonial because, regardless of the informant's intent in asking the questions, there was no evidence the defendants knew or suspected that the informants were agents of the police, or that their statements might be used at trial. (*Gallardo*, at pp. 67-68; *Arauz*, at p. 1399.) California law on this issue is in accord with federal court decisions that have found statements made to informants under analogous circumstances to be nontestimonial. (See *U.S. v. Dale* (8th Cir. 2010) 614 F.3d 942, 956; *U.S. v. Watson* (7th Cir. 2008) 525 F.3d 583, 589; *U.S. v. Udeozor* (4th Cir. 2008) 515 F.3d 260, 269-270; *U.S. v. Underwood* (11th Cir. 2006) 446 F.3d 1340, 1347-1348; *U.S. v. Hendricks* (3d Cir. 2005) 395 F.3d 173, 182-184; *U.S. v. Saget* (2d Cir. 2004) 377 F.3d 223, 229-230.)

Here there is no evidence that defendants knew they were speaking to police informants, or otherwise anticipated their statements would be used prosecutorially. Their statements accordingly were nontestimonial, and do not implicate the Sixth Amendment right to confrontation.

### E.   *No prejudice*

Finally, defendants fail to establish prejudice resulting from any allegedly erroneous admission of their *Perkins* statements. (See *People v. Jennings* (2010) 50 Cal.4th 616, 652 [alleged constitutional error under *Crawford v. Washington*

29

(2004) 541 U.S. 36 subject to harmless error standard].) Defendants' respective *Perkins* statements corroborated each other in all material respects. (See *Idaho v. Wright, supra*, 497 U.S. at p. 823 [corroborating evidence appropriate indicator that any error in admitting statement was harmless].) Both admitted that Gonzalez was the shooter and Escalante was the driver. Both stated that Gonzalez subsequently sold the gun he used in the shooting.

Defendants' *Perkins* statements were further corroborated by their recorded conversation with each other when they were subsequently placed in nearby cells. Escalante repeatedly confirmed that he was the driver when the crimes were committed. Gonzalez reiterated that he had changed the license plates on the Honda Civic before the shooting and that he had used a Smith and Wesson "Nina," or nine-caliber firearm.

In light of the evidence, any error was harmless beyond a reasonable doubt. (*People v. Jennings, supra*, 50 Cal.4th at p. 652.)

## III. Limiting discovery and testimony regarding the *Perkins* operation

Defendants contend the trial court violated their constitutional right to present a defense by precluding discovery of the identity of the *Perkins* agents, restricting cross-examination of witnesses regarding the *Perkins* agents, and limiting the testimony of their gang expert. The record discloses no abuse of discretion or constitutional violation. Defendants, moreover, fail to establish prejudice resulting from any alleged error.

30

## A.    *Proceedings below*

Gonzalez filed a motion pursuant to section 1054.1 seeking discovery of all documents relating to the *Perkins* operation.  At the April 25, 2017 hearing on the motion, Judge Kim ruled that defendants were not entitled to discover the identity of the *Perkins* agents unless they could demonstrate the agents were material witnesses.  Judge Kim further ruled, however, that defendants were entitled to know whether law enforcement officers met with the *Perkins* agents, what information was disclosed to the agents, and the manner in which the *Perkins* operation was held.

Gonzalez's counsel indicated on July 13, 2017, that he had received a report regarding the *Perkins* operation, but the report was insufficient.  The trial court advised Gonzalez's counsel that he could file a motion attaching the report, and if cause was shown, the court would issue a further order to produce.

Gonzalez filed a second discovery motion, which Escalante joined, seeking any reports and notes prepared by the officers who conducted the *Perkins* operation, all case names and numbers of other *Perkins* operations conducted by the agents used in defendants' operation, whether the agents had been involved in other operations in which there were allegations of coercion, the identity of the officers who briefed the agents and where the briefing occurred, and the identity of the officer who controlled the audio recording device used during the *Perkins* operation.  The motion stated that Gonzalez's counsel had received a report prepared by Detective Lackovic and summarized the following information from the report:  The *Perkins* operation was conducted under the direction of Detectives Lackovic, Cortes, and Irving; the operation lasted for

31

approximately two and a half hours; the *Perkins* agents were briefed on the pertinent facts of the case, including that the murder involved a driveby shooting, Gonzalez's known gang ties, and the victims' identities and known gang ties; the *Perkins* agents were not told the caliber of the gun or the type of car used; the entire operation was audio-recorded, and any breaks in the recording were initiated by one of the officers after the *Perkins* agents were removed from the cell; there was no recorded video for the operation.

At the October 3, 2017 hearing on the motion, the prosecutor represented that defense counsel had been provided all reports regarding the *Perkins* operation. The trial court directed the prosecutor to disclose additional information as to who was present when the *Perkins* agents were briefed, where the briefing took place, who controlled the recording device, and whether detectives listened to the audio as it was being recorded. The court otherwise denied the motion.

At trial, during cross-examination of Detective Irving, the trial court sustained relevance objections to defense counsel's questions as to whether the larger *Perkins* agent had previously been in custody, whether Detective Irving had used that agent previously, whether the agents had been paid more than $300,000 in the last four years, whether the agents were known as "Puppet" and "Bouncer," and whether they were former gang members.

Also at trial, the prosecutor objected to possible testimony by defendants' gang expert Flores as to whether a gang member would be afraid of another other gang member during a *Perkins* operation, and, because of such fear, confess to a crime he did not commit. The prosecutor argued that there was no evidence that

defendants had confessed because they were afraid of the *Perkins* agents.

Escalante's counsel argued that Flores was a gang expert who could testify about perceived threats by a young person placed in a jail setting with a much larger, heavily tattooed inmate. Flores could also testify about a young gang member's mindset in trying to impress such an inmate.

The trial court ruled that Flores could not testify as to the fear a person would feel in a jail cell with another gang member "because that's just common sense . . . . You can just argue it." The trial court noted that Flores was not an expert in psychology. The court further ruled that Flores could not testify about defendants' positions in any gang hierarchy, because Flores had not interviewed defendants. The court indicated that defense counsel could have Flores opine based on hypothetical facts, "just like a hypothetical was presented to the [prosecution's] gang expert."

Based on the trial court's ruling, defendants' counsel decided not to call Flores as a witness.

B. **No abuse of discretion or constitutional violation**

Section 1054.1 requires the prosecution to disclose to the defense certain categories of evidence in its possession, including "[t]he names and addresses of persons the prosecutor intends to call as witnesses at trial," and "[a]ny exculpatory evidence." (§ 1054.1, subds. (a), (e).) An appellate court generally reviews a trial court's ruling on discovery matters for abuse of discretion. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1105.)

**1.** *Identity of* Perkins *agents*

The record discloses no abuse of discretion. The prosecution did not intend to call the *Perkins* agents as witnesses at trial, and defendants fail to establish that disclosing the identity of the agents or the agents' participation in other *Perkins* operations would lead to any exculpatory evidence.

Defendants contend the trial court's rulings impaired their ability to challenge the reliability of their inculpatory statements to the *Perkins* agents. Defendants claim they should have been allowed to present to the jury the circumstances under which defendants' statements were made. According to defendants, relevant circumstances include the larger agent's exact height, the agents' nonverbal behaviors and demeanor, the agents' understanding of their instructions for the operation, the layout of the cells, and the agents' proximity to defendants during the operation.

The trial court's rulings did not preclude defendants from presenting the evidence they claim to have been denied. Defendants had the opportunity to elicit testimony concerning the *Perkins* operation by cross-examining Detective Irving, who oversaw the operation and testified at trial. Irving testified on cross-examination that he watched the entire *Perkins* operation via a live video monitor. Defendants had the opportunity to question Irving about the operation, including any instructions given to the agents, the agents' nonverbal behaviors and demeanor, the cell layout, and the agents' proximity to defendants. The agents' names, their participation in previous *Perkins* operations, and whether they were former gang members were not relevant to the circumstances in which defendants' statements were made.

34

Defendants were not precluded from presenting evidence concerning the larger agents' height relative to that of defendants. The jury heard through Detective Irving's testimony that the larger agent was approximately six feet tall and weighed 300 pounds. The jurors could also see defendants, who were present in court.

*Crane v. Kentucky* (1986) 476 U.S. 683, on which defendants rely, is distinguishable. In that case, which involved a police interrogation, not a *Perkins* operation, the Supreme Court held that the trial court erred in precluding the defendant from eliciting testimony about the physical circumstances in which his confession was obtained. (*Id.* at p. 691.) These circumstances included the defendant's detention in a windowless room for a protracted period of time, surrounded by as many as six police officers during the interrogation, and repeatedly being denied permission to telephone his mother. (*Id.* at p. 685.) The defendant's resulting confession encompassed "a host of local crimes," including shooting a police officer, several robberies, and murder committed during a robbery. (*Id.* at p. 684.) The defendant's confession was also full inconsistencies. (*Id.* at p. 685.)

Defendants' inculpatory statements in this case were not obtained during a police interrogation. Defendants were not precluded from presenting evidence of the physical circumstances in which their statements were made. The evidence defendants were precluded from presenting—the identity of the *Perkins* agents—was not relevant to the claim that their statements were coerced.

35

## 2. *Limitation of expert testimony*

The trial court did not abuse its discretion by limiting proposed testimony by defendants' gang expert, Flores. "'A witness is qualified to testify about a matter calling for an expert opinion if his peculiar skill, training, or experience enable him to form an opinion that will be useful to the jury.' (*People v. Davis* (1965) 62 Cal.2d 791, 800.) The question becomes whether the expert opinion given was helpful to the trier of fact. The reception of expert opinion testimony is within the sound discretion of the trial court. (*People v. Haeussler* (1953) 41 Cal.2d 252, 261, overruled on other grounds in *People v. Cahan* (1955) 44 Cal.2d 434.) Even though facts may be within the knowledge or understanding of the trier of fact, the conclusions to be drawn therefrom may require expert testimony. (*Wells Truckways v. Cebrian* (1954) 122 Cal.App.2d 666, 677; 1 Witkin, Cal. Evidence (3d ed. 1986) The Opinion Rule, § 474, pp. 445-446.) 'The decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that [persons] of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' [Citation.] An expert's opinion is admissible when '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801, subd. (a).)" (*People v. Harvey* (1991) 233 Cal.App.3d 1206, 1226-1227.) The trial court's ruling that a young gang member would be intimidated or afraid when placed in a cell with another gang member was a matter of "common experience," obviating the need for expert testimony and was not an abuse of discretion. (*Ibid.*)

36

Defendants' comparison of Flores's proposed testimony to that of the prosecution's gang expert, Detective Fuentes, underscores the difference between matters of common knowledge and those that are "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Fuentes testified that a Hispanic gang member in county jail would be expected to align with "Southsiders." If he instead aligned with the "paisas," he would be beaten. The dynamics of gang alignments and affiliations is a matter sufficiently beyond common experience that expert testimony would assist the jury. Fear of another gang member in a cell, on the other hand, is not beyond the common knowledge of the jury.

### 3. *No prejudice*

Defendants fail to establish prejudice resulting from the alleged evidentiary errors. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4. ["[O]nly evidentiary error amounting to a compete preclusion of a defense violates a defendant's federal constitutional right to present a defense"]; *People v. McNeal* (2009) 46 Cal.4th 1183, 1203 [rejection of some evidence concerning a defense reviewed for harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)].)

Defendants were not precluded from presenting evidence concerning the gang dynamics in a jail setting. During cross-examination of Detective Irving, defendants elicited testimony that gang members do not want to be perceived as a "wimp" in jail and that, the more serious their crime, the greater respect they garner.

As discussed earlier, defendants' inculpatory statements corroborated each other. Both admitted Gonzalez was the

37

shooter and Escalante the driver. Defendants' subsequent conversation with each other corroborated their earlier individual statements.

In light of the evidence as a whole, defendants fail to establish that the trial court's evidentiary rulings denied them the ability to present a defense or constituted prejudicial error.

## IV. Alleged judicial misconduct

Defendants' claims that judicial misconduct undermined the credibility of their eyewitness identification expert, and that the trial court improperly presided over their motions for a new trial fail because they demonstrate no prejudice as the result of the alleged misconduct.

### A. *Proceedings below*

Dr. Pezdek testified for the defense as an eyewitness identification expert. During Pezdek's testimony, the trial court interrupted, stating, "No. No examples. You've answered the question." Later, after overruling an objection, the trial court told Pezdek, "But let's just give a short answer, please." Pezdek's response to a previous question had been lengthy. After several subsequent lengthy responses by Pezdek, the trial court, after overruling an objection, stated, "But I would like answers that are under five minutes, so let's move it along, please." Pezdek continued to give lengthy responses. Overruling another objection, the trial court told Pezdek, "You have one minute to finish your answer." Later, after Pezdek answered another question, the trial court stated, "All right. I've heard it twice now. Next question, please, and then we're going to take a break."

During the break, defendants' attorneys moved for a mistrial. Gonzalez's counsel stated, "The court's demeanor

comments, rushing . . . the defense witness . . . I believe is really exhibiting a sense of impatience and hostility towards the field of eyewitness identification and this witness, and . . . I feel it's being conveyed to the jury." The trial court denied the mistrial motion.

When Pezdek's testimony resumed, Escalante's counsel asked about the correlation between a witness's confidence and accuracy. The trial court sustained an objection, stating, "I don't think that can be given." Counsel then asked if there was some correlation between memory and an expressed level of confidence. Following another objection, the trial court said, "All right. One moment. Don't answer that. Excuse me for just a second."

After a pause in the proceedings, the trial court returned to the courtroom and apologized to the jury for the interruption. Escalante's counsel asked to rephrase the last question. The court responded: "Well my concern here is that every situation is different. I don't think that there could be a correlation. Every fact situation, every scenario is different, so—" The trial court then addressed Pezdek: "All right. Are you done shaking your head at me, madam witness?" Escalante's counsel objected, and the court responded:

"No. You will not object. She laughed at me once, and now she's shaking her head at me. I deserve just as much respect as a doctor deserves, so if you want to rephrase your question, you may rephrase it, but I don't deserve to be laughed at from someone on the witness stand or have a head shaken at."

The following sidebar discussion then occurred:

"The court: Your witness laughed at me earlier, before I got off the bench, which is one of the reasons why I got off the bench because she was laughing at me in my ruling. I don't deserve that. [¶]

39

Just now, when I was making my ruling, I don't deserve her shaking her head at me. I'm sorry it reflects badly on her, but too bad.

> "[Counsel]: For the record, Your Honor, I was looking at Dr. Pezdek. I didn't see her laughing, nor did I observe her shaking her head."

Defendants made another motion for mistrial, which the trial court denied, stating:

> "I'm sorry, but your witness reflects on your clients' credibility and your case. If your witness is not schooled enough not to laugh at the judge or to not agree with one of my answers, that's on you and that's on her. [¶] As a judge, I demand respect in my courtroom. . . . [¶] I'm not going to sit here and be offended by your witness in front of my jury. Now, your witness has been testifying perfectly fine, but for the fact that she repeats her answers three times, and this court does have the right to limit testimony and move things along. [¶] But I'm sorry, I'm not granting a mistrial for something your witness did to me."

Pezdek resumed her testimony after the sidebar discussion. After the noon recess, the trial court addressed the jury: "Ladies and gentlemen, I'd like to just read to you a couple of things prior to starting. I won't deny this morning that I was suffering from a minor health affliction. My patience may have been a tad short, so I apologize for that."

The court then instructed the jurors as follows: "Please do not take anything I say or do during the trial as any indication of what I think about the facts, the witnesses—I'll also include the attorneys—or what your verdict should be."

The court then read CALCRIM No. 315, the jury instruction on eyewitness identification.

After the verdicts but before sentencing, defendants filed a motion for a new trial. Escalante also filed a challenge for cause under Code of Civil Procedure section 170.1, seeking to recuse Judge Meyer from hearing the motion. Judge Meyer ordered the cause challenge stricken as untimely and facially insufficient. The court also denied the new trial motion.

In its written order, the court stated:

"In this case, the Court has not expressed favoritism for or antagonism against any of the parties in this case; indeed, as Defendant notes, the undersigned expressed regret regarding her short patience during witness testimony and made jury instructions to that effect. The undersigned believes that she can preside over this case with impartiality, and she has an ethical obligation to do so, because there is no legal reason for her recusal."

The court also stated under oath, "I am not prejudiced or biased against or in favor of any party to this proceeding or their counsel."

## B. *No prejudice*

A defendant seeking reversal due to alleged judicial misconduct must establish prejudice. (*People v. Abel* (2012) 53 Cal.4th 891, 914.) Prejudice must be determined by considering all the surrounding circumstances, not simply a determination that "'"the trial judge's conduct left something to be desired, or even [that] some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial."'" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1321 (*Seumanu*).) Prejudice is established only when it is reasonably probable the jury would have reached a different verdict had the court refrained from the challenged conduct. (*People v. Harris*

41

(2005) 37 Cal.4th 310, 350-351, citing *Watson, supra*, 46 Cal.2d at p. 836.) We conclude from our review of the entire record that a different verdict was not reasonably probable.

The trial court instructed the jury not to take its words or actions as indicating its view of the facts, the witnesses, or the attorneys. The court then read the jury instruction on eyewitness identification. Jurors are presumed to understand and follow the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

The crucial and overwhelming evidence against defendants was their admissions during the *Perkins* operation and their subsequent jail conversation between themselves. Based on our review of the record, we conclude it is not reasonably probable that the jury would have reached a different result had the trial court not directed its comments toward Dr. Pezdek.

### C. *Denial of new trial motions*

The trial court did not abuse its discretion in denying defendants' motions for a new trial, based on the alleged judicial misconduct discussed above. A trial court is vested with considerable discretion in ruling on a motion for mistrial, which should be granted only if the trial court finds that the defendant's chances of receiving a fair trial have been irreparably damaged. (*People v. Dement* (2011) 53 Cal.4th 1, 39, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) As we have already rejected defendants' claim of judicial misconduct and have found no prejudice, we also find no abuse of discretion.

### D. *Challenge for cause*

Denial of a challenge for cause under Code of Civil Procedure section 170.1 is reviewable only by writ of mandate. (Code Civ. Proc., § 170.3, subd. (d); *People v. Freeman* (2010) 47 Cal.4th 993, 1000.) Defendants did not seek a writ of mandate

and therefore forfeited any statutory claim of error. (*Freeman*, at p. 1000.) Their basis for seeking appellate review of the recusal motion is the purported denial of the due process right to a fair trial. (*People v. Peoples* (2016) 62 Cal.4th 718, 787 (*Peoples*) [appellate court may review order denying motion to disqualify to the extent it concerns constitutional rights to due process].)

"'[T]he [federal] due process clause operates more narrowly' than Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii) and justifies judicial disqualification only under the '"most 'extreme facts.'"'" [Citations.] To establish a federal due process violation, "'there must exist '"the probability of actual bias on the part of the judge."'"'" (*Peoples, supra*, 62 Cal.4th at p. 787.)

The record here discloses no extreme facts or probability of actual bias on the part of Judge Meyer. Judge Meyer acknowledged that she had been short on patience and apologized to the jury. She instructed the jury not to take her statements or conduct as an indication of the court's views about the facts, the witnesses, or the attorneys. At the hearing on the new trial motions, Judge Meyer acknowledged that her "testy" behavior may not have been appropriate but stated her belief that the instructions to the jury had rectified any error. Finally, Judge Meyer submitted a statement under oath that she was not biased for or against any party. We find no due process violation under these circumstances.

## V.  Trial court's statements during jury selection
### A.  *Forfeiture*

Defendants arguably forfeited their right to challenge the trial court's statements during jury selection by failing to object. (*Seumanu, supra*, 61 Cal.4th at p. 1357 [challenge to trial court's

comments during voir dire is claimed judicial error, not instructional error, forfeited by failure to timely object].) Defendants contend, however, the trial court's comments concerning reasonable doubt, the presumption of innocence, and the right not to testify misinstructed the jury and can be challenged under section 1259. That statute allows an appellate court, absent an objection in the trial court, to "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259; see *People v. Brown* (2003) 31 Cal.4th 518, 539, fn. 7.) We exercise our discretion under section 1259 to address defendants' arguments.

### B.   *Proceedings below*

On May 7, 2018, at the beginning of jury selection, the trial court discussed with prospective jurors a criminal defendant's right to a trial, the presumption of innocence, and the right against self-incrimination. The court told the first panel of prospective jurors that the presumption of innocence "basically means . . . a person is absolutely presumed innocent up to and until 12 jurors unanimously decide differently that that person is guilty." The court then proceeded to explain what that concept meant in the prospective jurors' "everyday lives."

To illustrate the presumption, the trial court told a story about a dog that fell out of a friend's car window onto the freeway. After the friend pulled over to the freeway shoulder, a CHP officer pulled up behind him. The court then addressed the prospective jurors as follows:

> "Now, if you had been driving down that freeway at the time that you saw my friend's car on the side of the freeway, and then you saw a CHP officer on the side of the freeway with lights and

sirens on the side, come on, what's the first thing you're going to think, 'Oh, I bet he was speeding.' 'Oh, I bet he was in the carpool lane alone.'"

The trial court continued:

"We think the worst, don't we?  We think, 'What did that person do?'  We're already making presumptions that person did something, and usually, something bad.  [¶] Well, that's not giving my friend the presumption of innocence at all, is it?  No."

The trial court then modified its example as a preface to its explanation of the right not to testify:

"So let's just say, for argument's sake, my friend on the side of the road was charged with some kind of a charge . . . and he exercises his right to a trial.  [¶]  . . . So the evidence shows, throughout the trial, that . . . a dog had . . . fallen out of the car, and maybe the charge is animal cruelty.

"But the dog fell out of the car.  Even witnesses testify, you know, it was an accident or it looked like an accident. . . .  [¶]  At the end of the prosecution's case-in-chief, they say, 'Thank you, Your Honor.  We have no more witnesses.  We rest.'  And you could be thinking . . . to yourselves, at that point: 'All right.  There's no case here.  I don't feel like the presumption of evidence has been eroded away—and certainly not to the level of proof beyond a reasonable doubt.'

"And by the way, the definition of 'proof beyond a reasonable doubt' is sort of that state of the evidence that leaves you with an abiding conviction of the truth of that charge.  The only other definition that I allow in court is the idea that it's a lasting

belief in the truth of that charge. . . . [¶] . . . So let's just say that's the state of the evidence.

"Well, if the presumption of innocence is not gone, it has not been overcome by this very heavy burden called 'proof beyond a reasonable doubt,' then why on earth should the defendant have to testify to anything? It's almost as if they've already testified, and they sat up here, and they said, 'I'm innocent,' and then got right back down.

"So the law is sort of already presuming you've heard the other side of the story, which is the presumption. Now, the presumption can be overcome, so please don't get me wrong. I don't mean to diminish the prosecution at all. . . . [I]t can be overcome.

"But the whole point is: if it hasn't been overcome, then we don't make a defendant actually, physically take a witness stand to have to say, 'I'm innocent,' and then get back down. The law essentially does it for you."

The trial court added:

"So sometimes in criminal trials . . . I hear jurors say, 'Well, I can't vote because I will not necessarily have heard from the defendants.' . . . [¶] [I]f they choose not to testify—sometimes I get people who feel like, 'Well, I haven't heard both sides, so I can't make a decision if I haven't heard both sides.' But the fact is you have. You have heard both sides. The law has given you the other side. And so in that respect, we don't force a person to testify against themselves, and that's part of the reason why we have that particular r[u]le."

The trial court told the second panel of prospective jurors a story about her father-in-law, who had Alzheimer's, to illustrate

46

the presumption of innocence. The court then explained the right against self-incrimination and the presumption of innocence:

"Let's just say, for argument's sake, [the prosecutor] puts on his case. . . . [W]e have a couple of weeks' worth of evidence, and then he says, 'I'm all done, Your Honor. I rest,' and I say, 'Okay.'

"Now, although you're not deliberating yet as a solid jury, you are, individually, maybe thinking to yourselves, and you're allowed to ponder individually—'. . .where was the crime? I don't know that one of these two people did this. I'm still at a loss here.

"Let's just say that's the state of the evidence, and that's what the defense feels the state of the evidence is, as well. So if the state of the evidence is that the presumption of innocence has not been overcome, then why on earth do you need to hear from any of the defendants in a trial because that presumption has not been overcome?

"It would be as if it was no different than one of them takes the stand, and says, 'I'm innocent,' and then he goes and sits down again. The law is already sort of giving you a little bit of what, theoretically, testimony could be, so you are actually hearing both sides. It's just the law gives you the other side, and the other side is the presumption. So we do not force defendants to have to testify if they don't want to. [¶] . . . [¶]

"But the idea is if the case is not there, and the defense feels that in that state of the evidence the presumption has not been overcome, you should not feel an abiding conviction of the truth of the charge at that point in time, then why are we bothering to hear from the defendants at all?

47

"In other words, they don't have to prove their innocence. They are already presumed innocent."

The next day, the trial court told the combined panel of prospective jurors about the reasonable doubt standard:

"The law does not require [the prosecutor] to prove this case beyond any shadow of a doubt or beyond all doubt. The law doesn't require absolutes. The law just requires reasonableness, so proof beyond a reasonable doubt. It doesn't even say 'all reasonable doubt.' It just says 'a reasonable doubt.'"

On May 14, 2018, the trial court preinstructed the impaneled jurors. The court instructed the jury on the presumption of evidence and the burden of proof in accordance with CALCRIM No. 220:

"As we discussed during the voir dire, a defendant in a criminal case is presumed to be innocent, and this presumption requires that the People prove the defendant guilty beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."

On May 24, 2018, after the close of evidence, the trial court instructed the jury pursuant to CALCRIM Nos. 220 and 355 on the presumption of innocence, the burden of proof beyond a reasonable doubt, and the right not to testify.

C. *No reasonable likelihood the trial court diminished the burden of proof*

In assessing defendants' argument that the trial court's comments diminished the prosecution's burden of proof, the relevant question is whether "'there is a reasonable likelihood

48

that the jury understood the instructions [as a whole] to allow conviction based on' insufficient proof." (*People v. Daveggio & Michaud* (2018) 4 Cal.5th 790, 840 (*Daveggio*).)

### 1. *Presumption of innocence and reasonable doubt*

Defendants claim the trial court undermined the presumption of innocence and the reasonable doubt standard by suggesting the presumption could be "eroded away" or "overcome" by proof beyond a reasonable doubt when the prosecution rested. The presumption of innocence remains until a unanimous jury verdict finds guilt proven beyond a reasonable doubt. (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159.) We find no reversible error.

The trial court told the first panel of prospective jurors that the presumption of innocence "basically means . . . a person is absolutely presumed innocent up to and until 12 jurors unanimously decide differently that that person is guilty." The court similarly told the second panel of prospective jurors the "presumption lasts up to and until 12 jurors decide that that presumption has been overcome."

Defendants contend the trial court diminished the reasonable doubt standard by stating: "The law doesn't require absolutes. The law just requires reasonableness, so proof beyond a reasonable doubt. It doesn't even say 'all reasonable doubt.' It just says 'a reasonable doubt.'" Defendants also take issue with the trial court's statements that a "blatant accusation" with "no proof" and "no trial" is the antithesis of the presumption of innocence; that the presumption of innocence is the equivalent of the defendant taking the stand and saying, "I'm innocent"; and the court's request that jurors "give the presumption of innocence

49

until you have more information" as incorrect statements of the law.

We reject defendants' contentions that there is a reasonable likelihood the jury misapplied the law because of the trial court's statements. The trial court's statements during voir dire were "merely a portion of the guidance provided to prospective jurors— let alone seated jurors—and the balance of the court's instructions made clear that the People bore the burden of proof beyond a reasonable doubt." (*People v. Potts* (2019) 6 Cal.5th 1012, 1039.) The impaneled jurors were repeatedly instructed on the principles of reasonable doubt and presumption of innocence once the trial began. Considering the instructions given and the evidence presented at trial, it is not reasonably probable that the jury misapplied the law. (*People v. Holt* (1997) 15 Cal.4th 619, 662 [trial court's description of the reasonable doubt standard did not "create such an indelible impression on prospective jurors" that they were unable to follow specific instructions given when case was submitted to the jurors for decision].) "Indeed, even instructions *during* trial that misdescribe the burden of proof may, in light of other instructions, leave no reasonable likelihood that the jury misunderstood the proof required." (*Daveggio, supra,* 4 Cal.5th at p. 842.)

Defendants next contend the trial court erred by suggesting jurors could individually reach a conclusion about whether the presumption of innocence had been overcome when the prosecution rested, in violation of their duty not to form an opinion about the case until deliberations. We find no error.

Defendants incorrectly equate thinking about the case with jury deliberations. "A juror who holds a preliminary view that a party's case is weak does not violate the court's instructions so

long as his or her mind remains open to a fair consideration of the evidence, instructions, and shared opinions expressed during deliberations." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 73.) As our Supreme Court stated in *People v. Ledesma* (2006) 39 Cal.4th 641, 729, "it would be entirely unrealistic to expect jurors not to think about the case during the trial and when at home." The high court in that case found no error in the trial court's comments when excusing the jury for the day that they could continue to think about the case, but they could not communicate their thoughts to anyone until they were together again for deliberation. (*Ibid.*)

The trial court in this case preinstructed the impaneled jurors to "keep an open mind throughout the trial" and admonished, "[d]o not make up your mind about the verdict or any issue until after you have discussed it with your fellow jurors and only after deliberations." We presume the jury followed the court's instructions. (*People v. Washington* (2017) 15 Cal.App.5th 19, 26 (*Washington*).)

### 2. *Right not to testify*

Defendants contend the trial court diminished the right not to testify by suggesting a defendant need not testify if, at the close of the prosecution's case, guilt had not been proven beyond a reasonable doubt. "By negative implication," defendants argue, the trial court suggested that "if the prosecution had provided proof of guilt beyond a reasonable doubt when it rested, the defendant *would* need to testify."

"A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in

51

the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.)  Defendants fail to do so.

The trial court discussed one scenario in which a defendant may choose not to testify.  The court was not obligated, as defendants claim, to present other scenarios and other reasons not to testify.  The trial court's comments, moreover, must be considered in the context of the trial record as a whole to determine whether there is a reasonable likelihood the jury misapplied the court's instructions.  (See *People v. Houston* (2012) 54 Cal.4th 1186, 1229.)  The court also told the prospective jurors that under the Fifth Amendment, "we don't make someone who is accused of a crime have to testify against him or herself in a trial."  The trial court told the second panel, "we do not force defendants to have to testify if they don't want to."  The court also formally instructed the impaneled jurors on the right not to testify pursuant to CALCRIM No. 355 before deliberations began.  As a general rule, courts presume that juries can and will dutifully follow instructions they are given.  (*Washington, supra*, 15 Cal.App.5th at p. 26; see *Daveggio, supra,* 4 Cal.5th at p. 842 [comments made during jury selection are less significant than instructions at the close of evidence].)  The record discloses no reversible error.

## VI.    Alleged instructional and prosecutorial error

Defendants contend the trial court erred by instructing the jury pursuant to CALCRIM No. 315 in effect at the time of the trial, which contained a "misleading implication" that an eyewitness who is more certain of his or her identification is more likely to be accurate.  Defendants further contend the prosecutor exploited this misleading implication during cross-examination of defendants' eyewitness expert.

We find no judicial or prosecutorial error.

## A.     *Proceedings below*

During Dr. Pezdek's testimony, the trial court instructed the jury with the then operative version of CALCRIM No. 315, which asked the jury to consider, among 14 other factors, "how certain was the witness when he or she made an identification?"[9] The prosecutor then cross-examined Dr. Pezdek:

> "Q. [Y]ou indicated that percentage or confidence is only relevant at the initial point of— right after the crime occurred; is that accurate?
>
> "A. No. . . . Whenever the first identification occurs, the first time a witness is shown a photographic lineup or a field show-up or whatever, at that first opportunity to make an identification, the expressed confidence of the witness is going to be indicative of their likely accuracy.
>
> "Q. Okay. And then if they come—I don't know, a month later—and they identify in court, and they say, 'I'm 100 percent confident,' you're saying that that has no relevance—you shouldn't even

---

[9]     The Judicial Council modified CALCRIM No. 315 in 2022. The 2022 version states that a trial court should include the "How certain was the witness" language in its instructions when there is evidence a witness has expressed certainty about an identification. (Bench Notes to CALCRIM No. 315 (2022 ed.).) When the certainty language is included in the trial court's instructions, the court must also instruct the jury that "[a] witness's expression of certainty about an identification, whether the identification was made before or at the trial, may not be a reliable indicator of accuracy" and recite several factors the jury may consider when evaluating the significance of the witness's certainty. (*Ibid.*)

consider the person saying, 'I'm 100 percent confident[?]'

"A.  Should not even consider it . . . .  If the witness initially said, 'I think that's him, but I can't really tell,' and then, in your hypothetical, a month later, comes to court and looks at that same person, well heavens, a lot of people would figure out, 'Hey, it's the same person.  It must be him.  That's him.  I'm 100 percent confident.'  So . . . it's the bias of this in-court identification that can be the total cause of that high confidence.

"Q.  [Y]ou're familiar with CALCRIM 315; correct?

"A.  Yes.

"Q.  And you're aware that, in CALCRIM 315 . . . the law says that you can consider the confidence of a witness's identification of a defendant.  [I]t does say that; correct?

"A.  Absolutely . . . .  That's what I'm just saying right now.  The CALCRIM instruction doesn't say how to consider the confidence, and that's what I was clarifying . . .—how it's to be considered.  [¶]  But the confidence expressed by . . . a witness who comes into court and says, 'That's the person.  I'm 100 percent confident.'  If, in the previous four years, hasn't ever said that, . . . the confidence is not going to be a useful indication of whether they're really recognizing the person or not.

"Q.  Well, the CACRIM doesn't say:  'You can only consider the first identification of the witness.'

"[Escalante's counsel]:  Objection; argumentative, Your Honor—

"The court:  Overruled.

54

"[Escalante's counsel]: —Also, calls for a conclusion.

"The court: . . . Actually, I just read, ladies and gentlemen, that exact CALCRIM to you. That's the same item we were reading. So it says what I said it says. Go from there sir."

The prosecutor had no further questions. The trial court also gave the then current version of CALCRIM No. 315, which included the certainty factor language, in its final jury instructions.

### B.     People v. Lemcke

In *People v. Lemcke* (2021) 11 Cal.5th 644, 647, 665 (*Lemcke*), the California Supreme Court acknowledged that "[c]ontrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy'" and that "'jurors . . . tend to overvalue the effect of . . . certainty . . . in determining the accuracy of eyewitness identifications.'" The high court noted that the then current version of CALCRIM No. 315 did not correct the common misconception that a witness's high degree of certainty in an identification correlates to accuracy. (*Id.* at pp. 647, 666.) Rather, by "merely directing the jury to consider a witness's level of certainty, without any further caveats, [the instruction] effectively operates to reinforce that misconception." (*Id.* at p. 666.)

The Supreme Court also warned that "[t]he risk of juror confusion is heightened by the structure of CALCRIM No. 315, which lists witness certainty among numerous other factors the jury should consider when assessing the eyewitness testimony. As written, the instruction implies that each of these factors have a direct, linear bearing on accuracy. For instance, 'How well

55

could the witness see the perpetrator' implicitly prompts the jury to believe that if the witness could see the perpetrator well, the identification should be given more weight, and vice versa; 'How closely was the witness paying attention,' 'Was the witness under stress when he or she made the observation,' 'Did the witness ever fail to identify the defendants,' all do the same.  Hearing the certainty instruction in this context increases the risk that the jury will infer certainty operates the same way—as having some direct relationship with the accuracy of the identification." (*Lemcke, supra*, 11 Cal.5th at p. 666.)

Despite the risks of allowing a jury to consider the level of an eyewitness's confidence to determine the accuracy of an identification, the court in *Lemcke* noted that inclusion of the certainty factor in CALCRIM No. 315 does not, by itself, violate due process.  (*Lemcke, supra*, 11 Cal.5th at pp. 646-647, 661.)  A due process violation occurs only if the jury instruction—""'in the context of the instructions as a whole and the trial record'""—renders the defendant's trial fundamentally unfair, most often by lowering the prosecution's burden of proof.  (*Id*. at pp. 647, 655, 661, quoting *People v. Foster* (2010) 50 Cal.4th 1301, 1335.)

The *Lemcke* court's examination of the record before it also revealed sufficient safeguards to prevent the jury from improperly inferring that a witness's certainty in making an identification ensures its accuracy.  The Supreme Court concluded, "when considered "'in the context of the instructions as a whole and the trial record'" [citation], . . . listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render [defendant's] trial fundamentally unfair or otherwise amount to a due process violation."  (*Lemcke, supra*, 11 Cal.5th at p. 661.)

Despite the absence of a due process violation in the case before it, the court in *Lemcke* nevertheless determined "there is a risk that the [then] current version of [CALCRIM No. 315] will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy." (*Lemcke, supra*, 11 Cal.5th at p. 669.) To avoid that risk, the Supreme Court exercised its supervisory powers to direct California trial courts to omit the certainty factor language from CALCRIM No. 315 until the language might be revised to minimize possible juror misdirection. (*Lemcke*, at pp. 646-648, 669.)

## C. *No judicial or prosecutorial error*

Defendants do not contend the trial court's instruction pursuant to CALCRIM No. 315 or the prosecution's cross-examination concerning that instruction deprived them of due process. We reject defendants' alternate claim of prejudicial error.

In determining whether instructing the jurors on identification certainty was reversible error, we must consider the jury instructions as a whole. (*Lemcke, supra*, 11 Cal.5th at p. 658.) The jury here was instructed that defendants were presumed innocent and that the prosecutor had the burden of proving each element of the offenses beyond a reasonable doubt. The jury was also instructed that the prosecutor had the burden of proving beyond a reasonable doubt that defendants committed the crimes. The jury was further instructed it "alone must judge the credibility or believability of the witnesses" and that "[p]eople sometimes honestly . . . make mistakes about what they remember." In light of the instructions as a whole, we conclude there was no reversible error. (*Ibid.*)

57

Even assuming any error by the trial court or the prosecutor, we see no resulting prejudice. Lopez, Sr., the only witness who identified Escalante as one of the perpetrators, did not say he was certain about his identification. Defendants presented testimony of Dr. Pezdek, an eyewitness identification expert, "who explained the limited circumstances when certainty and accuracy are positively correlated." (*Lemcke, supra*, 11 Cal.5th at p. 647.) More importantly, the identification was not the only—or even strongest—evidence connecting defendants to the crimes. Defendants' admissions to the *Perkins* agents and during their jail conversation with each other were the most compelling evidence of guilt. Given this evidence, it is not reasonably probable defendants would have obtained a more favorable result had the trial court omitted the certainty factor language from CALCRIM No. 315 and had the prosecutor not cross-examined Dr. Pezdek about that instruction. (*People v. Sanchez* (2016) 63 Cal.4th 411, 463.)

## VII. Gang sentencing enhancements

Effective January 1, 2022, the law affecting defendants' sentences changed. Assembly Bill 333 amended the requirements for proving the "pattern of criminal gang activity" necessary to establish the existence of a criminal street gang. (Assem. Bill 333, § 3; *People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*).) As relevant here, Assembly Bill 333 amended section 186.22, subdivision (e)(2) to preclude use of a currently charged offense as a predicate offense to establish a "pattern of criminal gang activity."

Defendants contend, the Attorney General concedes, and we agree that the amended statute applies here, as defendants' judgments are not yet final on appeal. (*People v. Delgado* (2022)

58

74 Cal.App.5th 1067, 1087 [Assem. Bill 333 amendments to § 186.22 apply retroactively to defendant whose judgment was not yet final]; *Lopez, supra*, 73 Cal.App.5th at p. 344 [same].)

### A.    *Gang enhancement findings*

The Attorney General also concedes that under Assembly Bill 333, defendants' current offenses cannot be used to establish a pattern of criminal gang activity and that the prosecution proved, at most, only one predicate offense, not two offenses as required by section 186.22.[10]  The Attorney General agrees with defendants that the gang enhancement findings (but not the gang-murder special circumstance finding) must be vacated.

Defendants further contend their firearm enhancements imposed pursuant to section 12022.53, subdivision (e)(1) on counts 1, 2, and 4 must also be vacated because they are premised on findings that a principal violated section 186.22, subdivision (b).[11]  The Attorney General does not dispute this contention.

---

[10]    The Attorney General concedes that the prosecution's evidence of the convictions of Jose Rangel, Enrique Hernandez, and Jesus Hernandez for murder was evidence of a single predicate offense.

[11]    Although the trial court struck these enhancements at sentencing as to Escalante and stayed the enhancements as to Gonzalez under section 654, even if the punishment for the enhancement was stricken or stayed, the jury's "enhancement finding could impact defendant[s] in a future case:  'Striking an aspect of an enhancement does not "operate to defeat the a factual finding of the truth of the [allegation], instead, such act merely serves to prohibit a certain purpose for which the [allegation] may be used."'" (*People v. Fuentes* (2015) 1 Cal.5th 218, 225.)

59

We vacate the gang enhancement findings, including the firearm enhancements imposed pursuant to section 12022.53, subdivision (e)(1) on counts 1, 2, and 4, and remand the matter to give the People the option of retrying those allegations under the law as amended by Assembly Bill 333.[12]

**B.** *Gang-murder special circumstance finding*

Defendants contend the jury's true finding regarding the gang-murder special circumstance allegations (§ 190.2, subd. (a)(22)) must also be vacated under the law as amended by Assembly Bill 333. The Attorney General disagrees, arguing that Assembly Bill 333's amendment of the gang-murder special circumstance is unconstitutional.[13] Appellate courts are divided on this issue. (Compare *People v. Rojas* (2022) 80 Cal.App.5th 542 (*Rojas*), review granted Oct. 19, 2022, S275835, with *People v. Lee* (2022) 81 Cal.App.5th 232 (*Lee*), review granted Oct. 19, 2022, S275449.)

In *Rojas*, a divided panel in the Fifth Appellate District held that Assembly Bill 333 is unconstitutional to the extent it narrowed the scope of conduct made punishable under section

---

[12] Because we conclude the gang enhancements were imposed in violation of section 186.22, subdivision (e)(2), we do not address defendants' other arguments concerning proof of the gang predicate offenses in connection with the gang allegations.

[13] The Attorney General initially agreed with defendants that the jury's finding regarding the gang-murder special circumstance must also be vacated under Assembly Bill 333. However, in a subsequent supplemental brief, the Attorney General changed its position and argued that Assembly Bill 333 unconstitutionally amended the gang-murder special circumstance enacted by voters in Proposition 21 (as approved by voters, Primary Elec. (Mar. 7, 2000)).

190.2, subdivision (a)(22).  (*Rojas, supra*, 80 Cal.App.5th at p. 555, review granted.)  Section 190.2 sets forth a list of special circumstances in which the punishment for first degree murder is death or LWOP.  (§ 190.2, subd. (a).)  Proposition 21, enacted by California voters in 2000, added a new special circumstance to this list.  (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 11, pp. 121-122.)  That special circumstance applies to murders where "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."  (*Ibid.*; § 190.2, subd. (a)(22).)

Assembly Bill 333 amended the definition of a "criminal street gang" in section 186.22, subdivision (f) by narrowing that definition.[14]  (*Rojas, supra*, 80 Cal.App.5th at pp. 552-553, review granted.)  The *Rojas* majority concluded that the legislative amendment was unconstitutional as applied because California

---

[14]    Assembly Bill 333 narrowed the definition of a criminal street gang in section 186.22, subdivision (f) in several ways:  (1) It excludes from the definition of a criminal street gang those associates or groups whose members have individually, but not collectively, engaged in a pattern of criminal gang activity.  (2) It restricts the definition of a "pattern of criminal activity" by requiring that prior offenses must have commonly benefitted a gang, and the benefit must be more than reputational.  It also requires that the last of the offenses used to establish a pattern of criminal gang activity must have occurred within three years before commission of the current offense.  (3) It excludes from the definition of a criminal street gang groups or associations whose primary activities include looting or felony vandalism, but does not include the crimes listed in section 186.22, subdivision (e).  (*Rojas, supra*, 80 Cal.App.5th at pp. 552-553, review granted.)

voters had restricted the Legislature's ability to amend the provisions of Proposition 21 by stating it could only do so with a two-thirds vote in each house or by a statute that becomes effective only when approved by the voters. (*Rojas, supra*, at p. 553; Voter Information Guide, Primary Elec., *supra*, text of Prop. 21, § 39, p. 131.) Because Assembly Bill 333 did not comply with that requirement, and effectively narrowed the scope of section 190.2, subdivision (a)(22), the *Rojas* majority held the amendment unconstitutional as applied. (*Rojas*, at pp. 557-558.)

In *Lee*, Division Four of this appellate district reached the opposite result. The court in *Lee* rejected the argument that Assembly Bill 333 impermissibly narrowed the scope of section 190.2, subdivision (a)(22) by amending the definition of a "criminal street gang" in section 186.22. (*Lee, supra*, 81 Cal.App.5th at p. 241, review granted.) Focusing on the voter's intent as expressed in the language of Proposition 21, the court in *Lee* found no indication that voters intended to prohibit any future amendment of section 186.22, subdivision (f) from being incorporated into the gang-murder special circumstance. (*Lee*, at pp. 241-242.) The court noted that in enacting Proposition 21, voters "clearly knew how to express the intent to freeze a statutory definition" by changing the ""'lock-in'"" date for determining the existence of qualifying offenses under the "Three Strikes" law. (*Lee*, at p. 243.) "Proposition 21 provided that 'for all offenses committed on or after the effective date of this act, all references to existing statutes in [§§ 667, subds. (c)-(g), 1170.125] are to those statutes as they existed on the effective date of this act, including amendments made to those statutes by this act.'" (*Ibid.*) Given these express time-specific references, the court in *Lee* concluded that "had the voters also intended section 11 of

Proposition 21 to make a time-specific incorporation of section 186.22, subdivision (f), they would 'have said so in readily understood terms.'" (*Ibid.*)

We find the court's reasoning in *Lee* to be persuasive and apply it here. Assembly Bill 333 is not unconstitutional as applied to the gang-murder special circumstance. The jury's true finding regarding the gang-murder special circumstance allegations under section 190.2, subdivision (a)(22) need not be vacated for that reason.

### C. *Proof of gang predicate offenses*

Because we conclude Assembly Bill 333 did not unconstitutionally amend section 186.22, subdivision (f) as applied to the gang-murder special circumstance, we address defendants' argument that the gang-murder special circumstance finding[15] must be reversed because the prosecution's proof of the "pattern of criminal gang activity" element of that enhancement constituted inadmissible hearsay and violated their Sixth Amendment right to confront and cross-examine witnesses. Defendants further contend the documentary evidence used to establish the date of the predicate offenses was inadmissible hearsay and violated their Sixth Amendment right of confrontation. Alternatively, defendants argue their trial counsel was ineffective for failing to object to admission of that evidence.

---

[15] Defendants make the same argument to vacate the jury's gang enhancement findings. We do not address this challenge to the gang enhancement findings because, as discussed in part VII.A., we conclude the gang enhancements were imposed in violation of section 186.22, subdivision (e)(2) and vacate the jury's findings as to those enhancements on that ground.

Defendants forfeited their argument concerning the documentary evidence used to establish the date of the predicate offense by failing to object to that evidence at trial. The record discloses no abuse of discretion in the admission of the prosecution's gang expert testimony, no violation of defendants' right of confrontation, and no ineffective assistance by defendants' trial counsel.

### 1. *Proceedings below*

During the testimony of Detective Fuentes, the prosecution's gang expert, the prosecutor offered three certified court documents to establish the gang predicate offense. Those documents indicate that on August 15, 2014, in Los Angeles Superior Court case No. TA127879, Jose Rangel, Enrique Hernandez, and Jesus Hernandez were convicted of the murder of Jonathan Sandoval and that the crime was committed on April 12, 2013. The jury in that case found true the allegation that Rangel personally discharged a firearm causing death. As to Enrique and Jesus,[16] the jury found true the allegation that a principal discharged a firearm. As to all three defendants, the jury found true the allegation that the offense was committed for the benefit of a criminal street gang. The certified court documents were admitted into evidence without objection.

Fuentes testified on direct examination that he was familiar with Rangel, Enrique, and Jesus. He explained that when he began training with the sheriff department's gang unit, "this was a case that was brought to my attention." Fuentes opined that Rangel was a gang member at the time of his offense

---

[16] Because they have the same surname, we refer to Enrique Hernandez and Jesus Hernandez by their first names to avoid confusion.

and that Rangel appeared to be a member of USV 13.  Fuentes based his opinion on tattoos on Rangel's body.  When the prosecutor asked Fuentes if he observed USV tattoos on Rangel's body, Fuentes responded in the affirmative.

Fuentes further opined that Enrique was a USV gang member, based on a large tattoo of the word "Compton" across Enrique's chest, his moniker, and his association with Rangel.  Fuentes also based his opinion on the fact that the murder victim, Jonathan Sandoval, was a known member of the East Side Paramount gang, USV's biggest rival.

Fuentes opined that Jesus was also a USV gang member, basing his opinion on a "Compton" tattoo on Jesus's arm, Jesus's association with Rangel and Enrique, and the fact that the murder victim was a rival gang member.

On cross-examination, Gonzalez's counsel asked Fuentes how he knew Rangel was a member of USV.  Fuentes responded: "When I first started my assignment at OSS, this was one of the first cases that was brought to my attention, and it was discussed amongst the investigators.  I know of him.  I'd never contacted him personally."

The following exchange ensued:

"Q.  Okay.  So you heard that he was a member of the USV?

"A.  I heard, and I saw documentation, yes, sir.

"Q.  You saw documentation?

"A.  Yes, sir.

"Q.  Well, what documentation?

"A.  I believe they were—they were either booking slips or FIR cards that indicated his tattoos . . .  [¶]  . . .  [¶]

65

"Q. . . . You basically knew he was a USV gang member because of what you had heard from other officers; is that right?

"A. Yes, from known knowledge of other investigators.

"Q. So it's what other investigators had told you?

"A. Yes."

Gonzalez's counsel then indicated he had a motion to make, but asked if he should "hold that in abeyance." The trial court responded, "[h]old it for now."

Gonzalez's counsel next cross-examined Fuentes about Enrique:

"Q. And did you know Enrique Hernandez, personally?

"A. No, sir.

"Q. But you indicated that he was a member of USV?

"A. A member or an associate.

"Q. . . . And is that also from what other investigators had told you?

"A. Yes.

"Q. And is it the same thing for Jesus Hernandez, who was convicted of the same murder in 2013?

"A. Yes, sir.

"Q. Same—same thing that you heard from other investigators?

"A. Correct."

66

Fuentes further testified on cross-examination that his opinion that the victim, Sandoval, was a rival gang member was based on what other investigators had told him.

Gonzalez's counsel also asked Fuentes, "So the predicates for Jose Rangel, he was convicted of—of murder on October 15th of 2014; is that—is that correct?" Fuentes responded, "I believe so. I can't confirm that."

On redirect examination, the following exchange between the prosecutor and Fuentes occurred:

"Q. You indicated that part of the basis for your opinion that [Rangel, Enrique, and Jesus are] USV gang members at that time, was that you observed booking photographs for each of these individuals at the time of their arrest for the murder charge; is that right?

"A. I believe I viewed those booking photos when I began training at OSS. I don't know if that was around—I believe that was around the same time they were convicted.

"Q. No. My question is: You've seen booking— you've seen booking photos of those individuals that were taken at the time of their arrest?

"A. Yes.

"Q. I believe that your testimony yesterday was that part of the basis of your opinion was they had tattoos that were consistent, in your opinion, with USV; correct?

"A. In my opinion, yes, sir.

"Q. Okay. And that was part of the basis of your opinion why they were USV gang members?

"A. Yes, sir.

"Q. And the fact that they were associating together at that time of the crime?

"A. Correct.

"Q. And you indicated, also, that you had learned that the victim of the—that incident was a—of the murder was an East Side Paramount gang member?

"A. Correct.

"Q. And you indicated that that was also the basis of your opinion, given that East Side Paramount is the main rival to the USV gang?

"A. It's the main rival to the USV gang that belongs to the Paramount clique; correct."

On recross-examination, Gonzalez's counsel asked Fuentes about the booking photographs:

"Q. [Y]ou indicated that you saw these booking photos with the tattoos of Mr. Rangel sometime in 2014; is that correct?

"A. When I began training in 2014, yes, that's around the time I saw those photos.

"Q. Okay. And you haven't seen them since?

"A. I have—I believe I have, yeah. [¶] . . . [¶]

"Q. [W]hen have you?

"A. When I found out that I was coming to this case.

"Q. [A]nd you took a look at those booking photos?

"A. I viewed numerous photos of members from USV 13. [¶] . . . [¶]

"Q. Okay. And you viewed this photo of Jose Rangel?

68

"A. That was one of them, yes."

During a subsequent sidebar conference, Gonzalez's counsel moved to strike Fuentes's testimony about "what he's heard from other investigators."

The trial court denied the motion, stating

"I was listening for this, specifically, on direct because of *Sanchez*,[17] and I did hear how he thinks that the three people in the predicates were gang members was based on him looking at . . . gang photos. [¶] That's how he came to his own opinion, and the photos, themselves, are not hearsay. So I'm okay with him giving an opinion that they were gang members based on those photos.

"Both of you, I believe, elicited from him . . . that he also spoke to other officers. So you actually elicited the hearsay under *Sanchez*. [¶] . . . [¶] [S]o then to come back and say, 'Well, I object to the answers,' I think that is inappropriate. [¶] And if there was one answer in direct examination that elicited hearsay, I think it's too late. It should have been asked . . . on direct."

The trial court then instructed the jury as follows:

"Ladies and gentlemen, I'm going to caution— that's all—about when a witness testifies to something they were told by someone else, one should be cautious about that. I'm sure many people have heard the concept of hearsay. [¶] However, testimony in which someone may have personal knowledge of things that were directly told to them by, perhaps, a perpetrator or suspect or a gang

---

[17]    *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

member or directly viewed by them, that is less cautious."

### 2. *Applicable law and standard of review*

#### a. Proof of predicate offense

To establish that a group is a criminal street gang for purposes of gang sentence enhancements, the prosecutor must prove, among other things, that the group's members engage in or have engaged in a pattern of criminal gang activity. (*People v. Lara* (2017) 9 Cal.App.5th 296, 326-327.) At the time of trial in this case, a pattern of criminal gang activity meant "'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense.'" (*Lopez, supra*, 73 Cal.App.5th at p. 345, quoting former § 186.22, subd. (e).) "Taken together the statutory scheme requires proof that gang members committed at least two predicate offenses within the statutory timeframe. Such proof will generally require evidence of who committed the crime and when they did so, as well as evidence of their gang membership and the nature of the crimes." (*People v. Valencia* (2021) 11 Cal.5th 818, 829-830.)

To prove that a particular gang meets the statutory requirements, the prosecution usually presents a gang expert to describe the name or "'identifying sign[s] or symbol[s]'" of the promoted gang; the gang's "'primary activities'"; and at least two offenses committed by the defendant or his fellow gang members to show the gang had engaged in a "'pattern of criminal gang activity.'" (*People v. Prunty* (2015) 62 Cal.4th 59, 75-85.)

70

**b.** Experts, hearsay, and *Sanchez*

Hearsay generally is inadmissible, unless it falls under an exception. (Evid. Code, § 1200, subds. (a), (b); *Sanchez, supra*, 63 Cal.4th at p. 676.) Although expert witnesses frequently acquire knowledge in their field of expertise from hearsay sources, "[t]he hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Sanchez*, at p. 676.)

In *Sanchez*, our Supreme Court explained that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez, supra*, 63 Cal.4th at p. 686.) The high court defined "[c]ase-specific facts" as "those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.) The court in *Sanchez* held that an expert's recitation of case-specific facts is prohibited if the facts are outside the expert's personal knowledge, do not fall under an exception to the hearsay rule, or have not been independently established by competent evidence. (*Id*. at pp. 676-677, 686.) The court in *Sanchez* preserved, however, an expert's ability to rely on and cite background information "regarding his knowledge and expertise and premises generally accepted in his field" and to "tell the jury *in general terms*" "the kind and source of the 'matter' upon which his opinion rests." (*Id*. at pp. 685-686.) To illustrate the distinction between general background information and case-specific facts, the court in *Sanchez* provided the following example in a gang-related context: "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a

71

witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Id.* at p. 677.)

### c. Confrontation clause and *Crawford*

In *Crawford*, the United States Supreme Court held that the admission of "testimonial" hearsay against a criminal defendant violates the Sixth Amendment right to confront and cross-examine witnesses. (*Crawford v. Washington, supra*, 541 U.S. at pp. 53-54.) In light of *Crawford*, the California Supreme Court in *Sanchez* held that an additional step of analysis is required in criminal cases to determine if an expert's statements qualify as "*testimonial* hearsay." (*Sanchez, supra*, 63 Cal.4th at p. 686.) After reviewing the relevant case law, the *Sanchez* court concluded hearsay statements are testimonial if they are made "primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Id.* at p. 689.)

Conviction records are not barred by the Sixth Amendment. (*U.S. v. Weiland* (9th Cir. 2005) 420 F.3d 1062, 1076-1077; *People v. Morris* (2008) 166 Cal.App.4th 363, 370-373.) "Conviction records in general are not testimonial in nature because they are 'prepared to provide a chronicle of some act or event relating to the public employee's duty' and are not 'produced to be used in a potential criminal trial or to determine whether criminal charges should issue.'" (*People v. Thompkins* (2020) 50 Cal.App.5th 365,

72

412, quoting *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225.)

Under state law, conviction records also fall within a hearsay exception allowing "admission of qualifying court records to prove not only the fact of conviction, but also that the offense reflected in the record occurred." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1460-1461; see Evid. Code, §§ 452.5, subd. (b)(1) [court record is admissible "to prove the commission . . . of a criminal offense [or] prior conviction"], 1280 [hearsay exception for records made by public employees as part of their duties].)

### d. Standard of review

We review the trial court's evidentiary rulings, including those concerning the hearsay nature of the evidence, for abuse of discretion. (*People v. Harrison* (2005) 35 Cal.4th 208, 230.) An abuse of discretion occurs when the trial court makes an error of law. (*People v. Patterson* (2017) 2 Cal.5th 885, 894; see *People v. Rowland* (1992) 4 Cal.4th 238, 266.)

If error is found, any violation of state evidentiary rules is reviewed for prejudice under the *Watson* standard. (*Sanchez, supra*, 63 Cal.4th at pp. 685, 698; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103; *Watson, supra*, 46 Cal.2d at p. 836.) A violation of the Sixth Amendment right of confrontation is reviewed for harmless error under the *Chapman* standard. (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 912; see *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)

73

### 3. *Forfeiture*

Defendants forfeited any claim that the records of conviction for Rangel, Enrique, and Jesus were not admissible to prove the date the predicate offense was committed by failing to object to the admission of those documents. (See *Seumanu, supra*, 61 Cal.4th at p. 1362.) Defendants also forfeited their claim that admission of the records of conviction to establish the date of the predicate offense violated their Sixth Amendment right of confrontation by failing to raise any objection on that ground in the trial court below. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.)

Defendants' alternative argument that their respective trial attorneys were ineffective for failing to object to admission of the records of conviction is unavailing. "It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Defendants fail to sustain their burden of demonstrating that counsel was ineffective for failing to object to admission of the records of conviction for the purpose of establishing the date of the predicate offense. As discussed, under California law, conviction records fall within a hearsay exception allowing admission of such records to prove that the offense reflected in the record occurred. (*People v. Duran, supra*, 97 Cal.App.4th at

74

pp. 1460-1461.) Conviction records are not barred by the Sixth Amendment. (*People v. Thompkins, supra*, 50 Cal.App.5th at p. 412.)

Defendants' reliance on *People v. Garcia* (2020) 46 Cal.App.5th 123 as support for their position is unavailing. The court in *Garcia* held that the prosecution may use records "to show the fact of the prior conviction" (*id.* at p. 171); however, a complaint from a prior case cannot serve as evidence proving the date of commission of the predicate offense. (*Id.* at p. 172 ["the only competent evidence proving the date of commission of [a] predicate offense was a copy of the complaint"].) The prosecution in this case introduced records created by a court employee. (Evid. Code, §§ 452.5, 1280.) It did not rely on allegations in a criminal complaint—created by the district attorney's office for use at a criminal proceeding—to prove the dates the crimes were committed. (See *Day v. Sharp* (1975) 50 Cal.App.3d 904, 914 [court may not accept the truth of allegations in pleadings just because they are part of a court file].) *Garcia* is therefore inapposite. Trial counsel was not ineffective for failing to object to admission of the certified court records of conviction.

**4.** *No abuse of discretion and no prejudicial error*

The trial court did not abuse its discretion by denying defense counsel's motion to strike Fuentes's opinion that Rangel, Enrique, and Jesus were USV gang members. The record shows that Fuentes based his opinion in part on tattoos he observed on Rangel, Enrique, and Jesus in booking photos taken at the time of their arrest for the predicate offense; their association with each other; and the fact that the victim was a known member of a rival gang. These facts constituted general background information within Fuentes's knowledge in his field of expertise.

75

(*Sanchez, supra*, 63 Cal.4th at p. 676.) Fuentes's opinion, based on his review of the booking photographs, was admissible expert testimony. (*Id.* at p. 677.)

Any error in denying defense counsel's motion to strike testimony he elicited from Fuentes that the gang expert's opinion was based in part on hearsay statements Fuentes heard from other law enforcement officers was harmless under either *Watson, supra*, 46 Cal.2d 818 or *Chapman, supra*, 386 U.S. 18. Fuentes's opinion that Rangel, Enrique, and Jesus were USV gang members, based on tattoos he saw on those individuals in their booking photographs, was admissible expert testimony. (*Sanchez, supra*, 63 Cal.4th at p. 676.) After Fuentes's testimony concluded, the trial court gave the jury a cautionary instruction concerning witness testimony based on hearsay statements. We presume the jury followed this instruction. (*People v. Chhoun* (2021) 11 Cal.5th 1, 28.)

## VIII. Section 1109

Assembly Bill 333 also enacted section 1109, which took effect on January 1, 2022. Section 1109 allows bifurcation of a gang enhancement charge under section 186.22, subdivisions (b) or (d) from the underlying offense. If requested by a defendant, the statute requires the defendant's guilt of the underlying offense to be determined before the enhancement charges are tried.[18]

---

[18]    Section 1109 provides:

"(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

We reject defendants' contention that section 1109 applies retroactively to afford them a new trial on their murder and attempted murder convictions. There is no language in section 1109 declaring its provisions to be retroactive. "'"No part of the Penal Code 'is retroactive, unless expressly so declared.' (§ 3.) '[T]he language of section 3 erects a strong presumption of prospective operation, codifying the principle that, "in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the [lawmakers] . . . must have intended a retroactive application." [Citations.] Accordingly, "'a statute that is

---

"(1) The question of the defendant's guilt of the underlying offense shall be first determined.

"(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence.

"(b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

77

ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective.""""" (*People v. Perez* (2022) 78 Cal.App.5th 192, 207 (*Perez*); accord, *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 (*Ramirez*).)

A """limited rule of retroactivity"" applies to newly enacted criminal statutes that are intended to ameliorate criminal punishment for certain crimes. (*Perez, supra*, 78 Cal.App.5th at p. 207.) In *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), the California Supreme Court "held that amendatory statutes that lessen the punishment for criminal conduct are ordinarily intended to apply retroactively." (*People v. Frahs* (2020) 9 Cal.5th 618, 627.) The Supreme Court has applied *Estrada*'s limited rule of retroactivity to statutes governing penalty enhancements, statutes governing substantive offenses, statutes expanding a defense to a crime (*Frahs*, at pp. 628, 629), and statutes making reduced punishment possible for a class of persons (*People v. Wright* (2006) 40 Cal.4th 81, 95).

Section 1109 does not reduce punishment for a crime, expand defenses to a crime, or make reduced punishment possible. Notwithstanding that section 1109 does none of these things, and the absence of express statutory language giving it retroactive effect, some appellate courts, applying *Estrada,* have held the statute applies retroactively. (See, e.g., *People v. Montano* (2022) 80 Cal.App.5th 82; *People v. Ramos* (2022) 77 Cal.App.5th 1116 (*Ramos*); *People v. Burgos* (2022) 77 Cal.App.5th 550 (*Burgos*), review granted July 13, 2022, S274743; *People v. Rodriguez* (2022) 75 Cal.App.5th 816.)

We disagree with these appellate courts' expansive application of *Estrada*'s "limited rule of retroactivity" to section 1109. Instead, we find the courts' decisions to the contrary in

78

*Ramirez, supra*, 79 Cal.App.5th 48, *Perez, supra*, 78 Cal.App.5th 192, and Justice Elia's dissent to the *Burgos* majority to be persuasive. We adopt the analysis in Justice Elia's dissent in *Burgos* and the courts' holdings in *Perez* and *Ramirez*. The *Estrada* rule of limited retroactivity applies only when a new law is ameliorative of criminal liability or punishment. Section 1109 has no such ameliorative effect. It therefore does not apply retroactively.

## IX.  Defendants' LWOP sentences do not violate equal protection

We reject defendants' argument that section 3051, subdivision (h), which denies youth offender parole hearings to 18- to 25-year-olds sentenced to LWOP, violates equal protection. We also reject Escalante's claims that he was denied the opportunity to make a *Franklin* presentation at sentencing or, alternatively, that his counsel was ineffective for not making an adequate presentation.

### A.  *Section 3051*

Section 3051 gives certain youth offenders the opportunity for parole in their 15th, 20th, or 25th year of incarceration, depending on the length of the sentence they are serving for their "controlling offense."[19]  (§ 3051, subds. (a)(2)(B), (b); see *Franklin, supra*, 63 Cal.4th at p. 277.)

As originally enacted, section 3051 afforded a youth parole eligibility hearing to juvenile offenders only, not to young adults. (*In re Trejo* (2017) 10 Cal.App.5th 972, 981 & fn. 6.)  The statute also excluded juveniles sentenced to LWOP, who were already

---

[19]  "Controlling offense" is the offense or enhancement for which the longest term of imprisonment was imposed. (§ 3051, subd. (a)(2)(B).)

eligible for resentencing under section 1170. (*People v. Acosta* (2021) 60 Cal.App.5th 769, 776 (*Acosta*).) In subsequent years, the Legislature expanded eligibility for youth offender parole hearings under section 3051, "'recogniz[ing] that the maturity process does not end at 18 and in many cases extends to at least 25 years of age.'" (*Acosta*, at p. 776.) The statutory amendments recognized that young adults, like juveniles, are not yet fully matured and have a lower degree of culpability and an increased potential for rehabilitation compared to adult offenders. (*In re Jones* (2019) 42 Cal.App.5th 477, 485.)

The Legislature also amended section 3051 to allow parole eligibility hearings for juveniles—but not young adult offenders—sentenced to LWOP. (§ 3051, subd. (b)(4); Stats. 2017, ch. 684, § 1.5.) The purpose of this amendment was to bring California into compliance with federal law articulating the constitutional limits on sentencing young offenders. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 394 (2017-2018 Reg. Sess.) Mar. 21, 2017, p. 4.) In *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), the Supreme Court held mandatory LWOP sentences for juveniles unconstitutional.[20] In *Montgomery v. Louisiana* (2016) 577 U.S. 190 (*Montgomery*), the Supreme Court made the prohibition on mandatory LWOP sentences for juveniles retroactive. *Montgomery* provided, however, that "[a] State may

---

[20] The Supreme Court in *Miller* allowed LWOP sentences for juvenile defendants who committed homicide, so long as the sentence was not mandatory—"that is, only so long as the sentencer has discretion to 'consider the mitigating qualities of youth' and impose a lesser punishment." (*Jones v. Mississippi* (2021) __ U.S. __ [141 S.Ct. 1307, 1314], quoting *Miller, supra,* 567 U.S. at p. 476.)

remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." (*Id.* at p. 212.) By amending section 3051, the Legislature sought "to remedy the now unconstitutional juvenile sentences of [LWOP]," without the need for "a resentencing hearing, which is time-consuming, expensive, and subject to extended appeals." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 394 (2017-2018 Reg. Sess.) Mar. 21, 2017, p. 3; *People v. Morales* (2021) 67 Cal.App.5th 326, 346-347 (*Morales*).)

Neither *Miller* nor *Montgomery* declared LWOP sentences for young adults unconstitutional, and section 3051 continues to exclude from the youth offender parole hearing process several categories of offenders, including young adults sentenced to LWOP. (§ 3051, subd. (h).) The statute "'permit[s] the reevaluation of the fitness to return to society of persons who committed serious offenses prior to reaching full cognitive and emotional maturity,' unless the person was 'between 18 and 25 years of age when they committed their offense [and] sentenced to [LWOP].' [Citation.] It therefore 'distinguishes both between those who committed their offenses under 18 years of age and those between 18 and 25 years of age, and between offenders 18 to 25 years of age sentenced to prison terms with the possibility of parole and those in the same age group who have been sentenced to [LWOP].'" (*Acosta, supra*, 60 Cal.App.5th at p. 777.)

After enactment of section 3051, the California Supreme Court decided *Franklin*, which created a process for offenders who qualified for a youth offender parole hearing under section 3051 to preserve youth-related mitigation evidence. (*Franklin, supra*, 63 Cal.4th at pp. 283-284.) A *Franklin* proceeding gives "'an opportunity for the parties to make an accurate record of the

81

juvenile offender's characteristics and circumstances at the time of the offense so that the Board [of Parole Hearings], years later, may properly discharge its obligation to "give great weight to" youth-related factors (§ 4801, subd. (c)) in determining whether the offender is "fit to rejoin society"'" despite having committed a serious crime while he was a child in the eyes of the law. (*In re Cook* (2019) 7 Cal.5th 439, 449.)

### B. *Equal protection*

"Both the Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee to all persons the equal protection of the laws. The right to equal protection of the laws is violated when 'the government . . . treat[s] a [similarly situated] group of people unequally without some justification.' [Citations.] 'The California equal protection clause offers substantially similar protection to the federal equal protection clause.'" (*People v. Jackson* (2021) 61 Cal.App.5th 189, 195 (*Jackson*).)

"To succeed on an equal protection claim, appellants must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." (*People v. Edwards* (2019) 34 Cal.App.5th 183, 195.) This initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged. (*People v. Morales* (2016) 63 Cal.4th 399, 408.)

If the appellant can establish a class of criminal defendants is similarly situated to another class of defendants who are sentenced differently, we look to determine whether there is a rational basis for the difference. (*People v. Edwards, supra*, 34 Cal.App.5th at p. 195.) Under this highly deferential standard,

82

"equal protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.'" (*People v. Turnage* (2012) 55 Cal.4th 62, 74 (*Turnage*).)

To raise a successful rational basis challenge, a party must negate "''every conceivable basis'" that might support the disputed statutory disparity." (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.) "It is both the prerogative and the duty of the Legislature to define degrees of culpability and punishment, and to distinguish between crimes in this regard. [Citation.] Courts routinely decline to intrude upon the 'broad discretion' such policy judgments entail. [Citation.] Equal protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law." (*Turnage, supra*, 55 Cal.4th at p. 74.) We independently review defendants' challenge to section 3051. (*Jackson, supra*, 61 Cal.App.5th at p. 195.)

Defendants' equal protection claim fails because even if we assume they are similarly situated to juvenile offenders sentenced to LWOP and to 18- to 25-year-old offenders sentenced to "de facto" LWOP, they fail to demonstrate that there is no rational basis for treating them differently from those two groups. Age is a rational basis for distinguishing juvenile LWOP offenders from young adults sentenced to LWOP. Drawing the line at age 18 is "'the point where society draws the line for many purposes between childhood and adulthood.'" (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482; see *Roper v. Simmons* (2005) 543 U.S. 551, 574.) In criminal sentencing matters, both the United States Supreme Court and the California Supreme Court have found the line drawn between juveniles and nonjuveniles to be a rational one. (See, e.g., *Miller, supra*, 567 U.S. at p. 471

["children are constitutionally different from adults for purposes of sentencing"]; *Roper v. Simmons, supra*, 543 U.S. at p. 574 ["The age of 18 is the point where society draws the line for many purposes between childhood and adulthood."]; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1380 [the age of 18 "is the line the [United States Supreme Court] has drawn in its Eighth Amendment jurisprudence"].)

Although section 3051 is not a sentencing statute, it impacts the length of sentence served. (*In re Murray* (2021) 68 Cal.App.5th 456, 464.) California appellate courts have therefore concluded that, for purposes of LWOP offenders, the line drawn at 18 is a rational one when distinguishing juvenile LWOP offenders from young adult LWOP offenders. (*Ibid.*; *Morales, supra*, 67 Cal.App.5th at p. 347; *Jackson, supra*, 61 Cal.App.5th at p. 199; *Acosta, supra*, 60 Cal.App.5th at pp. 779-780; *In re Jones, supra*, 42 Cal.App.5th at p. 482.) We reach the same conclusion here. The age threshold is rational and not arbitrary.

Young adult offenders sentenced to LWOP may also be treated differently from young adult offenders serving very lengthy non-LWOP sentences (the "functional equivalent" of an LWOP sentence) because, even assuming the two groups are similarly situated, there is a rational basis for distinguishing between them—"the severity of the crime committed." (*Acosta, supra*, 60 Cal.App.5th at p. 780.) Although both groups may involve young adult offenders convicted of first degree murder, "those sentenced to LWOP have also been found, beyond a reasonable doubt, to have committed that first degree murder under one . . . of the special circumstances that reflect that the particular first degree murder was in some manner aggravated or reflected a greater risk of harm to persons other than the

immediate murder victim or victims. [Citations.] As a result, [young adult] offenders who have been sentenced to LWOP have committed an aggravated form of first degree murder that distinguishes them from [young adult] offenders who have committed first degree murder but done so in the absence of any such aggravating factors." (*Jackson, supra*, 61 Cal.App.5th at p. 199.)

The law imposes LWOP sentences for "crimes the Legislature deems so morally depraved and so injurious as to warrant a sentence that carries no hope of release for the criminal and no threat of recidivism for society. In excluding LWOP inmates from youth offender parole hearings, the Legislature reasonably could have decided that youthful offenders who have committed such crimes—even with diminished culpability and increased potential for rehabilitation—are nonetheless still sufficiently culpable and sufficiently dangerous to justify lifetime incarceration." (*In re Williams* (2000) 57 Cal.App.5th 427, 436.)

Defendants here were convicted of a special circumstance murder. "The Legislature rationally judged this crime to be more severe and more deserving of lifetime punishment than nonspecial circumstance first degree murder." (*In re Williams, supra,* 57 Cal.App.5th at p. 436.) "[P]ublic safety, and the desire to punish those persons who commit first degree special circumstance murder more harshly than persons who commit first degree murder without aggravating circumstances, provide a plausible basis for our Legislature to treat these two classifications differently for purposes of section 3051." (*Jackson, supra*, 61 Cal.App.5th at p. 200.) Because there is a rational basis for distinguishing between a young adult LWOP offender

and a young adult offender serving a non-LWOP sentence—the severity of the crime committed—we conclude that no equal protection violation arose from denying defendants a section 3051 parole hearing. (See *In re Williams*, at pp. 435-436; see also *Jackson*, at pp. 199-200.)

Escalante's claim that he was improperly denied the opportunity to make a *Franklin* presentation fails because he was statutorily ineligible for a *Franklin* proceeding. Under section 3051, subdivision (h), Escalante, who was convicted of a first degree special circumstance murder he committed at age 18, was ineligible for a *Franklin* proceeding. The trial court accordingly had no obligation to provide Escalante with notice of the opportunity to make a *Franklin* presentation, and the absence of such notice did not result in any error. For the same reason, Escalante's counsel's failure to make a *Franklin* presentation did not constitute ineffective assistance.

## X. Defendants' LWOP sentences are not cruel and unusual punishment

Defendants contend their LWOP sentences constitute cruel and unusual punishment in violation of the Eighth Amendment and article I, section 17 of the California Constitution. Escalante claims his mandatory LWOP sentence is disproportionate to his culpability as an 18-year-old adult aider and abettor who was not the actual shooter. Gonzalez argues that because the jury's verdict did not include a finding that he was the shooter, his culpability must be assessed as if he were not the shooter. Neither argument has merit.

A court assessing a claim of cruel and unusual punishment must "decide whether the penalty given 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience

86

and offends fundamental notions of human dignity,' thereby violating the prohibition against cruel and unusual punishment of the Eighth Amendment of the federal Constitution or against cruel or unusual punishment of article I, section 17 of the California Constitution." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1042.)  A defendant ""attacking his sentence as cruel or unusual must demonstrate his punishment is disproportionate in light of (1) the nature of the offense and defendant's background, (2) the punishment for more serious offenses, or (3) punishment for similar offenses in other jurisdictions.""" (*In re Williams, supra*, 57 Cal.App.5th at p. 437.)

Escalante concedes his Eighth Amendment claim must be rejected under binding United States Supreme Court authority. (*Roper v. Simmons, supra*, 543 U.S. at p. 574 [age 18 is the appropriate cutoff for death penalty sentence eligibility].) California courts have similarly held that a mandatory LWOP sentence imposed on offenders 18 years of age and older does not violate article I, section 17 of the California Constitution.  (*In re Williams, supra*, 57 Cal.App.5th at pp. 437-439 [LWOP sentence not cruel and unusual punishment when imposed on 21-year-old convicted of intentional first degree murder]; *People v. Edwards, supra*, 34 Cal.App.5th at pp. 190-192 [functional equivalent of LWOP sentences imposed on 19-year-old offenders not cruel and unusual under state and federal Constitutions]; *People v. Perez* (2016) 3 Cal.App.5th 612, 617; *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220-1221; *People v. Argeta, supra*, 210 Cal.App.4th at p. 1482 [mandatory LWOP imposed on defendant who committed first degree murder five months after his 18th birthday not cruel and unusual under federal and state

Constitutions].) Defendants provide no persuasive reason for deviating from these cases.

Escalante's LWOP sentence is not grossly disproportionate to his culpability. Although Escalante was the driver and not the shooter, he admitted knowing in advance that Gonzalez would commit the shooting. As the trial court noted at sentencing, Escalante was "as culpable as the shooter."

As to Gonzalez, the jury found true the allegation that a principal discharged a firearm for purposes of the gang-related firearm enhancement. That finding, together with Gonzalez's admissions, establish that he was the shooter. Gonzalez's LWOP sentence is not grossly disproportionate to his culpability.

## XI. Driveby special circumstance

In *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 164, this court rejected the argument defendants raise in this appeal—that the driveby shooting special circumstance unconstitutionally fails to narrow the pool of individuals eligible for LWOP because it duplicates the elements of driveby first degree murder. We decline defendants' request that we reconsider that decision, which controls here.

## XII. Alleged cumulative error

We reject defendants' contention that the cumulative effect of the claimed errors identified in their appeals deprived them of due process of law and a fair trial. Because we have found none of the claimed errors to constitute individual errors, they cannot as a group constitute cumulative error. (*People v. Richardson, supra*, 43 Cal.4th at p. 1036.)

## XIII. Presentence custody credit

The Attorney General concedes Escalante is entitled to 1,876 days of custody credit rather than the 1,869 days he was

awarded.  On remand, the trial court is directed to recalculate and award Escalante 1,876 days of presentence custody credit.

## DISPOSITION

For each defendant, the gang enhancement allegation findings under section 186.22, subdivision (b) under counts 1, 2, and 4, and the gang-related firearm enhancement findings under section 12022.53, subdivision (e)(1) under those same counts are vacated.  The matter is remanded to the trial court for retrial of the gang allegations on those counts if the People so elect.  We direct the trial court to recalculate and award Escalante 1,876 days of custody credit and to prepare an amended abstract of judgment reflecting that presentence custody credit award and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgments are affirmed.


_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
HOFFSTADT, J.